NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12329

DZUNG DUY NGUYEN, administrator,[1] vs.  MASSACHUSETTS INSTITUTE
OF TECHNOLOGY & others.[2]


Middlesex.     November 7, 2017. - May 7, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Cypher, & Kafker, JJ.


Wrongful Death.  Negligence, Wrongful death, College.  Damages,
    Wrongful death, Conscious pain and suffering, Breach of
    contract.  Practice, Civil, Amendment of complaint.
    Workers' Compensation Act, Exclusivity provision.



Civil action commenced in the Superior Court Department on
September 6, 2011.

The case was heard by Bruce R. Henry, J., on motions for
summary judgment.

The Supreme Judicial Court granted an application for
direct appellate review.


Jeffrey S. Beeler for the plaintiff.
Kevin P. Martin (Yvonne W. Chan also present) for the
defendants.
Alan D. Rose, B. Aidan Flanagan, & Antonio Moriello, for
Amherst College & others, amici curiae, submitted a brief.

_____

[1] Of the estate of Han Duy Nguyen.

[2] Birger Wernerfelt, Drazen Prelec, and David W. Randall.

Jonathan A. Karon, Thomas R. Murphy, Mark F. Itzkowitz, & Lisa DeBrosse Johnson, for Massachusetts Academy of Trial Attorneys, amicus curiae, submitted a brief.

KAFKER, J. The plaintiff, Dzung Duy Nguyen, commenced a wrongful death action against the defendants, Massachusetts Institute of Technology (MIT), MIT Professors Birger Wernerfelt and Drazen Prelec, and MIT assistant dean David W. Randall, arising out of the suicide of his son, Han Duy Nguyen (Nguyen). The defendants are alleged to have been negligent in not preventing Nguyen's suicide. The motion judge allowed summary judgment for MIT and the individual defendants, finding no duty to prevent Nguyen's suicide. Although we conclude that, in certain circumstances not present here, a special relationship and a corresponding duty to take reasonable measures to prevent suicide may be created between a university and its student, we affirm the decision of the motion judge that the defendants are entitled to judgment as a matter of law.[3]

Background. We summarize the facts in the record in the light most favorable to the plaintiff. Godfrey v. Globe

---

[3] We acknowledge the amicus brief filed by the Massachusetts Academy of Trial Attorneys; and the amicus brief filed in support of defendants by Amherst College, Bentley University, Berklee College of Music, Boston College, Boston University, Brandeis University, College of the Holy Cross, Emerson College, Endicott College, Harvard University, Northeastern University, Simmons College, Smith College, Stonehill College, Suffolk University, Tufts University, Williams College, and Worcester Polytechnic Institute.

Newspaper Co., 457 Mass. 113, 114 (2010).  We reserve additional facts for our discussion of the legal issues.

1.  The parties.  At the time of his death on June 2, 2009, Nguyen was a twenty-five year old graduate student in the marketing program at MIT's Sloan School of Management (Sloan) and lived off-campus.  Prelec was a Sloan faculty member and served as Nguyen's graduate research advisor.  Wernerfelt was a Sloan faculty member and head of the Marketing Group Ph.D. program whose responsibility included advising graduate students concerning their coursework and research.  Randall was an assistant dean in MIT's student support services (student support) office.

2.  MIT support resources.  In May, 2007, after his first academic year at MIT and two years before his death, Nguyen contacted Sloan's Ph.D. program coordinator, Sharon Cayley, for assistance with test-taking problems.  Nguyen explained to Cayley that he was "failing all of my classes because I don't know how to take [examinations (exams)].  I know the course material, but it just won't happen for me on exams."  Cayley then referred Nguyen to an MIT student disability services office coordinator, who described some of MIT's accommodations for individuals with disabilities.  Nguyen declined such accommodations.  In her notes from her meeting with Nguyen, the coordinator wrote that Nguyen "does not want to connect with MIT

Medical.  (I recommended that he do so.)  Says it won't be helpful; no reason to do so" (emphasis in original).  After two meetings with the coordinator, Nguyen reported to Cayley that the meetings were of "absolutely no use . . . [the coordinator] seemed to think that because I was referred to her, that meant that I was disabled, and therefore had only disability accommodations to offer me."

On June 25, 2007, Cayley referred Nguyen to MIT's mental health and counselling service (MIT Mental Health) and informed Wernerfelt that this referral was Cayley's "response to [Nguyen's] expressed need for remedial study skills."  On July 9, 2007, Nguyen met with Dr. Celene Barnes, a psychologist at MIT Mental Health.  On meeting Barnes, Nguyen stated that he did not know why he "was referred here.  My issues have nothing to do with [mental health]."  During the intake meeting, Nguyen denied suicidal ideation.  Barnes "provided [a] brief overview of [information] on test anxiety and gave him handouts used in the test anxiety workshop [and] [o]ffered to work with him on this issue."  Nguyen "declined, stating again that he did not want to seek[] services at [MIT Mental Health] due to the stigma associated with it."

On July 25, 2007, Nguyen had a second appointment with Barnes.  She conducted a general intake, which irritated Nguyen because "he didn't know what other [mental health] issues had to

do with his test taking problem." During this meeting, Nguyen disclosed to Barnes that he had had a long history of depression with two prior suicide attempts during college but denied any present suicidal ideation. Nguyen also disclosed that he had been in treatment prior to coming to MIT and that he had resumed treatment with a psychiatrist in the area. Although Nguyen had hoped that his test anxiety issue would be resolved in one appointment, he agreed to follow up with Barnes at the start of the school year.

On July 29, 2007, Nguyen told Cayley that he found MIT Mental Health to be "useless," that Barnes "proceeded to turn me into a mental patient, and I was forced to discuss things that I really didn't want to," and that he doubted that MIT Mental Health was the "correct agency to solve my problem." Further, Nguyen questioned why Wernerfelt had to be informed of the referral to Barnes because Nguyen was "hoping to keep the circle as small as possible, since I'm very ashamed and embarrassed about [my test-taking problems]."

On August 9, 2007, Nguyen reported to Barnes that he was receiving treatment from Dr. John J. Worthington, a psychiatrist at Massachusetts General Hospital (MGH), not MIT Mental Health. Barnes offered to consult about treatment planning, but Nguyen declined. Subsequently, Nguyen informed Barnes that he had "been able to make other arrangements for treatment, so there

will be no need to search any further, but I really appreciate all of your effort thus far."

On September 6, 2007, Nguyen met with Randall, the assistant dean in the student support office.[4]  Before meeting with Randall, Nguyen had sent an electronic mail (e-mail) message to another student support dean, inquiring whether the student support office could help him with his problem, which was that he had "difficulty with taking exams, to the extent that [he was] failing classes" and asked if the student support office offered "any kind of counseling service that teaches study skills."  In their first meeting, Randall reported that Nguyen was "very committed to this not being seen as a 'problem' and [was] looking for a quick fix."  Toward the end of the meeting, Nguyen acknowledged that he had a long history of mental health issues and depression and that he was seeing a psychiatrist, Dr. Worthington, off campus.

On September 24, 2007, Nguyen returned to see Randall. Nguyen described a "long history of depression dating back to high school," and treatment by "several . . . therapists during college."  He also "acknowledged two suicide attempts in the

_____

[4] At the time, Randall was a licensed clinical psychologist. Both parties are in agreement, however, that Randall did not have a clinician-patient relationship with Nguyen in his nonclinical capacity as assistant dean in the Massachusetts Institute of Technology (MIT) student support services office.

past and frequent suicidal thoughts." Nguyen, however, stated that he "did not identify a specific plan [to commit suicide] . . . and [was] not imminently suicidal." Although perceiving that Nguyen was not an imminent threat, Randall "strongly encouraged" Nguyen to visit MIT Mental Health. But after his recent MIT Mental Health meeting with Barnes, Nguyen was resistant and stated that his current psychiatrist was already aware of his prior suicidal ideation and that Nguyen also had plans to see another therapist, Dr. Stephen Bishop, in Rhode Island.

By the end of the September 24 meeting, Nguyen gave Randall permission to contact Worthington, Bishop, and Barnes. Later that day, Randall left a voice message for Worthington. Subsequently, Nguyen revoked Randall's permission to contact Worthington and stated in an e-mail message that he would "like to keep the fact of my depression separate from my academic problems. I'd prefer that we not any further discuss the depression, that my academic problems can be framed in terms of a deficit in study skills instead. If you can offer any such aid, I'd be happy to further employ your services." On September 25, Randall acknowledged Nguyen's decision and replied that he "would still like to meet with you and think that I can be helpful." Randall also stated in the e-mail message that Nguyen was permitted "to schedule another [appointment]."

Nguyen did not respond to Randall's e-mail message and did not have any further meetings or contact with Randall after September, 2007.

Worthington followed up with Randall on September 27, 2007. Worthington was unable to share any information or confirm that Nguyen was his patient, but said that he could listen to Randall's concerns, especially regarding Nguyen's safety. Randall informed Worthington that Nguyen appeared "agitated, a little suspicious, and anxious, both at [the student support office] and MIT [Mental Health]," and of Nguyen's "suicidal thoughts and previous attempts." Worthington did not discuss the case further, but agreed the information should be taken seriously. On September 28, 2007, Randall told Barnes that he had spoken with Worthington about Nguyen, and wrote, "Let's keep in touch about this student." Barnes responded, "I agree, let's definitely keep in touch about [Nguyen]." Nguyen did not return to see Barnes or any other mental health provider at MIT Mental Health.

3. Nguyen's mental health history. Although Nguyen briefly sought out the student disability services office, MIT Mental Health, and the student support office between May and September, 2007, he extensively consulted with clinicians not affiliated with MIT. Between July, 2006, when Nguyen moved to Massachusetts, and May, 2009, Nguyen saw at least nine private

mental health professionals who collectively recorded over ninety in-person visits during this period.  There was no indication from any of these mental health professionals that Nguyen was at an imminent risk of committing suicide.

From July, 2006, two months before enrolling at MIT, to November, 2008, Nguyen was treated by Worthington, a psychiatrist at MGH.  Over the course of their forty-three in-person appointments, Worthington discerned nothing indicating that Nguyen was at an imminent risk of suicide.  Nguyen requested electroconvulsive therapy to treat his depression, and received six rounds of it at MGH in August and September, 2006.

Starting in September, 2006, Nguyen began therapy with a social worker at MGH and was scheduled for sixteen sessions. Nguyen disclosed to the social worker that he had occasional suicidal thoughts, but no suicidal intent or plan.  After their twelfth visit, Nguyen canceled his remaining appointments stating that his "time together [with the social worker had] not resulted in an inch of progress."

Nguyen's next therapist was Bishop, whom he saw for several months in Rhode Island beginning in October, 2007.  Bishop diagnosed Nguyen with dysthymic disorder, a chronic depressive condition.  Nguyen saw Bishop six times between October, 2007, and March, 2008, but stopped seeing him because of the distance and because Bishop did not accept his health insurance plan.

From April, 2008, to March, 2009, Nguyen sought treatment from a doctor at a private practice group who specialized in sleep disorders. This doctor did not think that Nguyen was at risk of suicide during the time she was treating him. Starting in August, 2009, Nguyen saw a psychologist affiliated with the same private practice group. In February, 2009, Nguyen canceled his future appointments with the psychologist because he believed his "sleep patterns [were] beginning to converge on nonpathology."

Next, in November, 2008, Nguyen met twice with another doctor to complete a psychological test. During the interview, Nguyen told that doctor that he was "not imminently suicidal." That same month, Nguyen stopped seeing Worthington because Nguyen believed him to be "too autocratic and didn't consider [Nguyen's] input."[5] Nguyen then began seeing yet another doctor and continued to see him through May, 2009. At Nguyen's initial appointment, that doctor noted that Nguyen "made two 'half-assed' suicide attempts. He denies suicidal ideation." At each appointment, the doctor and Nguyen discussed whether Nguyen had "any self-destructive thoughts . . . [or felt like] giving up."

---

[5] Nguyen had made a similar point in June, 2008, when he sent an electronic mail (e-mail) message to Worthington stating, "I need you to consider me as part of the team when it comes to my own treatment. . . . After all I am a PhD student at one of the world's top universities. Please give me a little credit here."

Nguyen denied any such thoughts or feelings.

In March, 2009, Nguyen began seeing a different doctor, with whom he had six visits.  Nguyen told the doctor about his two prior suicide attempts but denied any current suicidal ideation.  Throughout this time, the doctor did not believe that Nguyen was at an imminent threat of self-harm.

Nguyen's last appointment with this doctor was on May 28, 2009, five days before Nguyen's death.  The doctor noted that Nguyen "did not say anything that sounded imminently suicidal or hopeless, and we discussed more things that he would do toward exploring thesis and career options, and we made a next [appointment] for [June 18]."

4.  Nguyen's academic challenges.  At times during his studies at Sloan, Nguyen struggled academically and performed "well below average" in some of his courses.  During Nguyen's time at MIT, neither Wernerfelt nor Prelec was aware of Nguyen's history of severe depression or prior suicide attempts. Wernerfelt knew only that Nguyen had insomnia and test taking anxiety, and that he was consulting off-campus mental health professionals.

On May 9, 2008, Prelec was informed by one of his MIT colleagues that Nguyen was reportedly "out of it" and "despondent," potentially because Nguyen was "having trouble sleeping as of late."  On May 12, Prelec met with Nguyen and

reported to Wernerfelt that Nguyen is "sleep deprived . . . and is taking something on prescription to help him sleep. He is seeing a psychiatrist regularly, at Mass General (not MIT). Same person he has been seeing since he got here." Wernerfelt replied that Nguyen "has had some serious issues with exam anxiety, so I worry about the general[] [exams]. Perhaps we can give them in a less concentrated form . . . [t]hat way he can get a good grade under his belt . . . I think that it would be good to give him some confidence."[6]

On May 26, 2008, Wernerfelt was informed that Nguyen had performed poorly in a course that an MIT colleague taught. Nguyen had told that colleague that he had "medical problems that have prevented him from focusing on classes . . . [and] asked [the colleague] to consider his weakened health when he [took] the final." Wernerfelt responded to his colleague that Nguyen was "having serious problems. Some of his issues seem to peak at exam time, but there is much more to it than that. He has been seeing a psychiatrist at MGH (not MIT) as long as he has been here. I thus have no official information, but I do

---

[6] Wernerfelt testified that "general exams" were required for all MIT Sloan School of Management Ph.D. students. Students typically take these examinations at the end of their second year, over a period of several days.

believe that he is at risk."[7]  Wernerfelt suggested that his colleague be lenient and "grade him based on the problem sets" rather than his final examination.

On June 2, 2008, Wernerfelt sent an e-mail message to seven of Nguyen's professors, informing them that Prelec and he had "decided to reduce the pressure on [Nguyen] by spreading out his general[] [exams] over several weeks."  On June 4, Wernerfelt, "[i]n an attempt to reduce the pressure on [Nguyen] as much as possible," further modified Nguyen's examination schedule allowing Nguyen to take the examinations when he was ready.

In a June, 2008 self-evaluation form, Nguyen stated that his academic performance was "[b]elow average, due to my medical condition."  Nguyen indicated that the "primary nature of this illness [was] insomnia" and that he had "been seeing a team of doctors at [MGH] and elsewhere who have been trying to help me."  Nguyen described how "horrendously bad" his medical condition was, stating that "[t]here were days during which I was so completely debilitated for the entire day that I was unable to get out of bed at all, much less function properly" and that at one point he "had to be hospitalized because I was so delirious

---

[7] Wernerfelt testified that he meant "risk" to refer to "some adverse reaction if [Nguyen] were to get a really low grade" in Nguyen's economics course.  Wernerfelt stated that a low grade was "not a big deal" because if Nguyen got "a bad grade . . . he [could] take a makeup exam or . . . take another course instead" to satisfy the graduate school requirement.

and incoherent after not being able to sleep for over [seventy-two] hours." Nguyen further stated that he "would not be surprised if I have to be hospitalized again in the near future." Nguyen also stated that he was on his ninth different sleeping pill prescription and that he was still not functioning well. Nguyen did not disclose any history of depression, suicidal ideation, or his prior suicide attempts in his self-evaluation. After receiving Nguyen's self-evaluation, Wernerfelt offered to help Nguyen obtain a "leave from the program . . . such that [he] could return to a good situation once the [doctors] lick [his] sleeping problems."

On October 30, 2008, Nguyen sent an e-mail message to Wernerfelt and requested an examination schedule that would take place between January 12 and January 26, 2009, with his oral examination during the week of January 26 through January 30, 2009.[8] Prelec testified that Nguyen's performance "varied some, but overall it was not a good performance."

After Nguyen had completed his general examinations, the faculty in his department met in January, 2009, to discuss Nguyen's performance and whether he had passed. Wernerfelt advocated that "Nguyen should be passed and that the faculty should counsel him to pursue a master's degree." Wernerfelt

---

[8] Nguyen's general examinations originally had been scheduled for the summer of 2008.

also stated that "they might end up with 'blood on their hands'" if the faculty were to fail Nguyen.[9] One of Wernerfelt's colleagues testified that the phrase, "blood on our hands," was repeated several times. After the faculty passed Nguyen, Wernerfelt met with Nguyen to inform him that he had passed, although he was required to take certain additional courses to remain in the Ph.D. program. Further, Wernerfelt "laid out the path to a [Master's degree] . . . [and] [s]aid that all members of the faculty felt that he would be unhappy in a professorial job." In March, 2009, Nguyen sent an e-mail message to Prelec, telling him that "to be a professor" is what Nguyen "want[ed] more than anything. . . . [and he was not] convinced that anyone has really taken [his] health issues into consideration." Nguyen remained insistent that he would "still do everything in [his] power to ensure that [he] will finish the PhD."

Prelec met with Nguyen weekly during the spring of 2009 and noticed that Nguyen "seemed better" and was having fewer sleep problems. That semester, Nguyen served as a teaching assistant and, at the end of the semester, was offered another teaching assistant position for the fall of 2009, which he accepted. In

---

[9] In contrast to failing a course, failing general examinations could lead to dismissal from the graduate program. Wernerfelt testified that if Nguyen were to fail his general examinations, there was a "very small chance that . . . something bad could happen . . . such as [Nguyen] hurting himself or others."

May, 2009, Prelec recommended Nguyen for a summer research assistant position in an MIT laboratory. On May 27, 2009, Nguyen sent an e-mail message to the project investigator that he was "very excited about [the] project . . . [and] would be eager to begin very soon." Nguyen also requested an update about funding logistics, as he was under the impression that the MIT laboratory's "coffers were bottomless." Prelec was copied on this message and forwarded it to Wernerfelt, stating that he was "mildly nervous" about recommending Nguyen because "[w]ith this talk of bottomless coffers . . . [Nguyen] will rapidly offend . . . folks." In response, Wernerfelt suggested that "someone should talk to [Nguyen] about sending more respectful e-mails" and that "[p]erhaps we should offer to prescreen his e-mails . . . after two or three [Nguyen] might get the idea." Wernerfelt offered to take the lead on speaking with Nguyen about e-mail etiquette.

5. Nguyen's suicide. At approximately 7 A.M. on June 2, 2009, Nguyen sent the project investigator an e-mail message, on which he blind-copied Prelec:

"I forgot to mention that this upcoming Monday I have a doctor's appointment that I had scheduled a long time ago, so I won't be able to come into the office until about 11:30 that day. I hope that that won't be a problem.

"If we can quickly follow up on the conversation that we had yesterday, if you'll forgive me, I'd like to be honest with you about something. [Prelec] recommended me for this position . . . [a]nd I'm not an undergrad

anymore; I'm a grad[uate] student now.  For those reasons, it was disturbing, as well as a little insulting, to me that yesterday you took pains to express your expectations of me in a manner that presumed that I would give you anything less than this project deserved, that you would 'give me a signal' if you didn't think that my contribution amounted to something deserving of authorship credit, that 'there would be a problem' if it turned out that '[you] could do [the work] faster [your]self,' that you threatened me that you could tell by visual inspection whether my work was up to par.  I like to feel like I've earned the right not to have my effectiveness or my integrity questioned anymore, and to hear you do that yesterday was kind of hurtful.  I'm not sure that if you continue to do this that I'll be able to work as effectively as I'd like to be able to.  Although I keep asking about it, I'm not just doing this for the money.  I want to learn something and make a meaningful contribution . . . . Would it be possible that we could move forward with an understanding of good faith on my part?"

After receiving Nguyen's e-mail message, Prelec and the project investigator spoke about it.  The project investigator told Prelec that Nguyen had taken his comments out of context and that Nguyen misinterpreted his intentions and the tone of the meeting.

Prelec forwarded the e-mail message to Wernerfelt, asking if Wernerfelt could "talk to [Nguyen] as a somewhat neutral party . . . [Nguyen] is misreading things.  Even so, the tone of reply is totally out of line."  Wernerfelt responded, "I am so sorry.  I will talk to [Nguyen] and let you know what he says."

At approximately 9 A.M. on June 2, Nguyen arrived at a laboratory in a building on MIT's campus.  The laboratory coordinator noted that Nguyen's demeanor appeared "pretty

normal" and that Nguyen was preparing for a research project. After a number of missed calls between Nguyen and Wernerfelt, at 10:51 A.M., Nguyen reached Wernerfelt by telephone. Nguyen left the laboratory to take the call.[10] After the telephone call ended at approximately 10:59 A.M., Nguyen went to the roof of the building and jumped off the building to his death. A first responder administered first aid to Nguyen "a few seconds" after he landed and did not identify any signs of breathing, eye movement, pulse, or consciousness. It was determined that the immediate cause of Nguyen's death was "blunt trauma with head, skull, torso and extremity injuries" and that it occurred within "seconds."

Meanwhile, after Wernerfelt finished speaking with Nguyen, at 11:04 A.M., Wernerfelt sent an e-mail message to Prelec:

"I read [Nguyen] the riot act
"Explained what is wrong about the e-mail
"Told him that you or I would look over future e-mails he

---

[10] Wernerfelt testified that he contacted Nguyen because he had been forwarded Nguyen's e-mail message to the project investigator and that he wanted to help with Nguyen's "social skills." Wernerfelt testified that he "went through point for point" giving "advice and explanations" on what was improper with Nguyen's e-mail. Wernerfelt recommended that Nguyen, in the future, let him or Prelec review Nguyen's e-mail drafts. Wernerfelt reiterated that Nguyen "would be happier outside the academe" and "should think about getting a [M]aster's degree and pursuing a nonacademic job." At the conclusion of the telephone call, Wernerfelt told Nguyen that "some patching up would have to be done after this e-mail, and [Wernerfelt] thought [Nguyen] should . . . contact [Prelec] and the two of them could together figure out what the next steps would be."

> send[s] . . .
> "I said that we know that he is not out to offend anyone
> but that he seems poor at navigating the academe
> "Said that this is an example of why we all recommended
> that he take a [Master's Degree] and go out to get a job
> "I talked about some papers he could turn into [a Master's]
> thesis and volunteered to supervise it
> "Said that he made you look bad vs [the laboratory] and
> that some patching up was necessary
> "He will call you about what to do"

Later in the afternoon on June 2, 2009, one of Wernerfelt's colleagues sent an e-mail message to Wernerfelt that "I know you were worried about suicide, but you can feel positive that we tried very hard to help [Nguyen] (and especially you did so much to help him)."[11]

In 2011, the plaintiff commenced an action in Superior Court, alleging that the defendants' negligence caused Nguyen's death.  In March, 2016, the defendants moved for summary judgment and the plaintiff filed a cross motion for summary judgment.  In October, 2016, the defendants' motion for summary judgment was allowed and the plaintiff's cross motion for summary judgment was denied.  The plaintiff appealed from the denial of his motion, and we granted his motion for direct appellate review.

Discussion.  The plaintiff contends that the defendants owed Nguyen a duty of reasonable care and committed a breach of

---

[11] The colleague testified that Wernerfelt "didn't actually say suicide.  He said serious consequences, which I interpreted . . . as a risk for suicide."

this duty.  Additionally, the plaintiff argues that the record supports claims for punitive damages, conscious pain and suffering, and breach of contract.  The plaintiff also asserts that the Superior Court judge improperly denied the plaintiff's motion to amend the complaint to assert claims against former MIT chancellor Phillip Clay.  Lastly, the plaintiff contends that summary judgment should be entered in his favor that Nguyen was not an MIT employee at the time of his death for workers' compensation purposes.

1.  Standard of review.  Where the parties have cross-moved for summary judgment, we review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the unsuccessful opposing party and drawing all permissible inferences and resolving any evidentiary conflicts in that party's favor, the successful opposing party is entitled to judgment as a matter of law.  Epstein v. Board of Appeal of Boston, 77 Mass. App. Ct. 752, 756 (2010).  See Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-637 (2007), citing Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).

2.  Negligence claim.  a.  General negligence principles. "To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant [committed a breach of] this duty, that damage resulted, and that there was a causal relation between the

breach of the duty and the damage."  Jupin v. Kask, 447 Mass.
141, 146 (2006).  Generally, there is no duty to prevent another
from committing suicide.  Under our case law, "we do not owe
others a duty to take action to rescue or protect them from
conditions we have not created."  Cremins v. Clancy, 415 Mass.
289, 296 (1993) (O'Connor, J., concurring).  "[T]he law has
persistently refused to impose on a stranger the moral
obligation of common humanity to go to the aid of another human
being who is in danger, even if the other is in danger of losing
his life."  W.L. Prosser & W.P. Keeton, Torts § 56, at 375 (5th
ed. 1984).

b.  Special relationships and the duty to prevent suicide.
We have, however, recognized that special relationships may
arise in certain circumstances imposing affirmative duties of
reasonable care in regard to the duty to rescue, including the
duty to prevent suicide.  The classic case is the custodial
relationship, particularly jails or hospitals.[12]  In Slaven v.

---

[12] In noncustodial cases, a defendant is also "liable for another's death by suicide when, as a consequence of a physical impact, death results from an 'uncontrollable impulse, or is accomplished in delirium or frenzy.'"  Slaven v. Salem, 386 Mass. 885, 886-887 (1982), quoting Daniels v. New York, N.H. & H.R.R., 183 Mass. 393, 399-400 (1903).  The plaintiff asserts that the second scenario applies, that Wernerfelt triggered Nguyen's uncontrollable suicidal impulse by the "riot act" telephone call.  In this case, the "uncontrollable impulse" scenario does not apply, as there has been no prior physical

Salem, 386 Mass 885, 888 (1982), we addressed the duty and accompanying responsibilities of a jailor for the suicide of a prisoner in his custody.

> "One who is required by law to take or voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a duty (1) to protect them against unreasonable risk of physical harm, and (2) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others."

Id. at 887, citing Restatement (Second) of Torts § 314A (1965). We further explained that "[t]he comments to § 314A state that a 'defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury.'" Slaven, supra, citing Restatement (Second) of Torts, supra at § 314A comment e. Finally, we noted that in cases in other jurisdictions "that have addressed the issue of the liability of a jailor for the suicide of one in his custody, most have required that there be evidence that the defendant knew, or had reason to know, of the plaintiff's suicidal tendency." Slaven, supra at 888.

We likewise conclude that there are other special relationships, outside the custodial context, that may impose affirmative, albeit limited, duties in regard to suicide

---

injury causing the uncontrollable impulse. Slaven, supra at 887.

prevention.  We therefore turn to the scope of the university-student relationship, and the duties, if any, it imposes regarding suicide prevention.[13]

c.  The modern university-student relationship.  We begin with the Restatement (Third) of Torts, which states that "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship."  Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40(a) (2012). Included in the list of special relationships giving rise to such duty is "a school with its students."  Id. at § 40(b)(5). This, of course, is the beginning and not the end of the analysis.  There is a wide range of schools -- from elementary to graduate school -- and great differences in the scopes of student-school relationships.  Additionally, the Restatement (Third) of Tort's formulation of special relationship is not focused on the specific question of student suicide.

The particularities of the university-student relationship are of paramount importance in defining any duty.  Universities are clearly not bystanders or strangers in regards to their students.  See Mullins v. Pine Manor College, 389 Mass. 47, 51-

---

[13] Our use of the term "university" encompasses other institutions of higher education, including but not limited to colleges and universities.

52 (1983). The primary mission of universities is academic in nature.[14] Universities also sponsor and have special relationships with their students regarding athletics and other potentially dangerous activities. See, e.g., Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1370 (3d Cir. 1993) (duty of care to lacrosse player during practice); Davidson v. University of N. Carolina at Chapel Hill, 142 N.C. App. 544, 555-556 (2001) (duty of care to cheerleader during practice). See also Massie, Suicide on Campus: The Appropriate Legal Responsibility of College Personnel, 91 Marq. L. Rev. 625, 641 (2008) (Suicide on Campus). Cf. Kavanagh v. Trustees of Boston Univ., 440 Mass. 195, 202 (2003) (special relationship does not extend to athletes from other schools). They are also property owners and landlords responsible for their students' physical safety on campus. See Mullins, 389 Mass. at 51-52; Massie, Suicide on Campus, supra at 642. Furthermore, university involvement extends widely into other aspects of student life. See Dall, Determining Duty in Collegiate Tort Litigation: Shifting Paradigms of the College-Student Relationship, 29 J.C. & U.L. 485, 519 (2003) (universities "do not conceive of their

---

[14] For example, "[t]he mission of MIT is to advance knowledge and educate students in science, technology, and other areas of scholarship that will best serve the nation and the world in the 21st century]." http://web.mit.edu/facts/mission.html [https://perma.cc/KF4R-PQ3W].

educational role narrowly . . . and foster many aspects of student life and community involvement such as residential life, multicultural programs, student organizations, student government, student media, community service, internships and externships, technology, health and fitness, and spirituality"). Accord Regents of the Univ. of Cal. vs. Superior Court of Los Angeles, Supreme Court of California, No. S230658, slip op. at 27 (Mar. 22, 2018) (Regents) ("Along with educational services, colleges provide students social, athletic, and cultural opportunities. Regardless of the campus layout, colleges provide a discrete community for their students.").

But universities are not responsible for monitoring and controlling all aspects of their students' lives. "There is universal recognition that the age of in loco parentis has passed, and that the duty, if any is not one of a general duty of care to all students in all aspects of their collegiate life." Massie, Suicide on Campus, 91 Marq. L. Rev. at 640. See Mullins, 389 Mass. at 52 (describing major "changes in college life," and "the general decline of the theory that a college stands in loco parentis to its students"); Schieszler v. Ferrum College, 236 F. Supp. 2d 602, 610 (W.D. Va. 2002) ("colleges are not insurers of the safety of their students"). See also Bradshaw v. Rawlings, 612 F.2d 135, 139 (3d Cir. 1979) (describing end of loco parentis relationship "between college

and student that imposed a duty on the college to exercise control over student conduct and, reciprocally, gave the students certain rights of protection by the college").

University students are young adults, not young children. Indeed, graduate students are adults in all respects under the law. Universities recognize their students' adult status, their desire for independence, and their need to exercise their own judgment. Consequently the modern university-student relationship is respectful of student autonomy and privacy. See Bradshaw, 612 F.2d at 138 ("Trustees, administrators, and faculties have been required to yield to the expanding rights and privileges of their students"); Furek v. University of Del., 594 A.2d 506, 516-517 (Del. 1991) (describing "realities of modern college life where students are regarded as adults in almost every phase of community life" [quotations and citation omitted]). This includes students' personal mental health decisions. Indeed, the privacy of student mental health records are generally protected, absent the student's consent or an emergency where disclosure is necessary to protect the health or safety of the student or other persons. See Family Educational Right and Privacy Act of 1974, 20 U.S.C. § 1232g (2012). See also Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d-6 (2012) (imposing limitations on rights of nonclinicians in obtaining or disclosing individually

identifiable health information); Massie, Suicide on Campus, 91 Marq. L. Rev. at 648.[15]

In deciding whether a special relationship and accompanying duty exists between a university and a student in regard to suicide prevention, and whether a breach of such a duty has occurred, we must therefore take into account a complex mix of competing considerations. Students are adults but often young and vulnerable; their right to privacy and their desire for independence may conflict with their immaturity and need for protection. As for the universities, their primary mission is to educate and they no longer are acting in loco parentis, but they still have a wide-ranging involvement in the lives of their students. See, e.g. Mullins, 389 Mass. at 52; Bradshaw, 612 F.2d at 138. See also Regents, slip op. at 17.

d. A university's duty regarding suicide prevention. In analyzing whether a duty to prevent suicide falls within the scope of the complex relationship that universities have with their students, we consider a number of factors used to delineate duties in tort law. Irwin v. Ware, 392 Mass. 745, 756

_____

[15] Universities must also be attentive to the requirements of the Federal Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (2012), which states, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

(1984).  See Massie, Suicide on Campus, 91 Marq. L. Rev. at 639. "Foremost among these is whether a defendant reasonably could foresee that he [or she] would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so."  Irwin, supra.  A related factor is "reasonable reliance by the plaintiff [on the defendant], impeding other persons who might seek to render aid."  Id.  Other factors that have been considered relevant to special relationships and the creation of a duty in the university context are the "degree of certainty of harm to the plaintiff; burden upon the defendant to take reasonable steps to prevent the injury; some kind of mutual dependence of plaintiff and defendant upon each other, frequently . . . involving financial benefit to the defendant arising from the relationship; moral blameworthiness of defendant's conduct in failing to act; and social policy considerations involved in placing the economic burden of the loss on the defendant." Massie, Suicide on Campus, supra.  See Mullins, 389 Mass. at 51-53.  See also Lake, Still Waiting:  The Slow Evolution of the Law in Light of the Ongoing Student Suicide Crisis, 34 J.C. & U.L. 253, 257-277 (2008) (Still Waiting) (catalog of key cases and factors used by courts to determine duty); Regents, slip op. at 18 ("Students are comparatively vulnerable and dependent on their colleges for a safe environment.  Colleges have a superior

ability to provide that safety with respect to activities they sponsor or facilities they control").

With these considerations in mind, we conclude that a university has a special relationship with a student and a corresponding duty to take reasonable measures to prevent his or her suicide in the following circumstances.  Where a university has actual knowledge of a student's suicide attempt that occurred while enrolled at the university or recently before matriculation, or of a student's stated plans or intentions to commit suicide,[16] the university has a duty to take reasonable

---

[16] The Columbia Lighthouse Project, under the auspices of Columbia University, created the Columbia-Suicide Severity Rating Scale(C-SSRS), a suicide risk assessment tool that provides useful guidance.  See Columbia-Suicide Severity Rating Scale.  http://cssrs.columbia.edu/the-columbia-scale-c-ssrs/about-the-scale/ [https://perma.cc/TR7Y-S8JB].  More specifically, C-SSRS category four or five behavior is informative of what constitutes a student's stated plans or intentions to commit suicide:

> "4. Active Suicidal Ideation with Some Intent to Act, without Specific Plan -- Active suicidal thoughts of killing oneself and subject reports having some intent to act on such thoughts, as opposed to 'I have the thoughts but I definitely will not do anything about them.'

> "5.  Active Suicidal Ideation with Specific Plan and Intent -- Thoughts of killing oneself with details of plan fully or partially worked out and subject has some intent to carry it out."

(Emphasis in original.)  See Posner, Brent, Lucas, Gould, Stanley, Brown, Fisher, Zelazny, Burke, Oquendo, & Mann, Columbia-Suicide Severity Rating Scale (C-SSRS), Lifetime Recent, Version 1/14/09 m9/12/17 (2008).

measures under the circumstances to protect the student from self-harm.  See Mullins, 389 Mass. at 52 ("Parents, students, and the general community still have a reasonable expectation, fostered in part by colleges themselves, that reasonable care will be exercised to protect . . . students from foreseeable harm"); Schieszler, 236 F. Supp. 2d at 608-609 ("relationship between a college or university and its students can give rise to a duty to protect students from harms of which the school has knowledge," including risk of suicide); Restatement (Third) of Torts, § 40(b)(5); Massie, Suicide on Campus, 91 Marq. L. Rev. at 631 ("where college or university personnel are aware that a student has made serious suicidal threats or attempts, they have a duty to take reasonable steps to protect the student's safety").  See also Pavela, Questions and Answers on College Student Suicide:  A Law and Policy Perspective 8-9 (2006) ("[I]nstitutions of higher education face heightened risk of liability for suicide when they ignore or mishandle known suicide threats or attempts. . . . The main obstacle to better suicide prevention on campus is underreaction, especially the failure to provide [perhaps even require] prompt professional evaluation and treatment for any student who threatens or attempts suicide" [emphasis in original]).  We have sought to define here the circumstances creating the special relationship and the duty realistically recognizing the scope of the suicide

problem on university campuses, the capacities of nonclinicians, and the nature of the modern university-student relationship.[17]

_____

[17] It is estimated that 1,100 university students die by suicide ever year.  See Jed Foundation's Framework for Developing Institutional Protocols For the Acutely Distressed or Suicidal College Student 2 (2006), available at https://www.jedfoundation.org/wp-content/uploads/2016/07 /framework-developing-institutional-protocols-acutely- distressed-suicidal-college-student-jed-guide_NEW.pdf [https://perma.cc/8MLG-2T3U] ("Jed Framework").  "According to the Center for Disease Control and Prevention (CDC), suicide is the 'second leading cause of death among [twenty-five to thirty-four] year olds and the third leading cause of death among [fifteen to twenty-four] year olds.'  Thus, suicide prevention is not simply a focus for traditional college- and university- aged populations, but must also be a focus for graduate and professional schools.  The [twenty-five to thirty-four] year-old demographic factors prominently in most graduate and professional school programs and applies to the many college and university students who extend their education" (footnote omitted).  Lake, Still Waiting:  The Slow Evolution of the Law in Light of the Ongoing Student Suicide Crisis, 34 J.C. & U.L. 253, 254–255 (2008).  See Center for Disease Control, National Center for Injury Prevention and Control, 10 Leading Causes of Death by Age Group, United States -- 2015, https://www.cdc.gov /injury/wisqars/pdf/leading_causes_of_death_by_age_group_2015- a.pdf [https://perma.cc/A8TN-N2HQ] (from most recent statistics available from CDC, in 2015, suicide was second leading cause of death among both fifteen to twenty-four and twenty-five to thirty-four year olds).

The number of students with suicidal thoughts is even more alarming.  According to an Internet-based survey of 26,000 undergraduate and graduate students administered by the National Research Consortium of Counseling Centers in Higher Education, six per cent of undergraduate and four per cent of graduate students reported seriously considering suicide within the past twelve months.  See Drum, Brownson, Denmark, & Smith, New Data on the Nature of Suicidal Crises in College Students:  Shifting the Paradigm, 40 Prof. Psychol.:  Res. & Prac. 213, 214–216 (2009).  Similarly, in the American College Health Association's National College Health Assessment, which surveyed over 63,000 students at ninety-two colleges and universities in 2017, 10.3

It is important to understand the limited circumstances creating the duty. It is definitely not a generalized duty to prevent suicide. Nonclinicians are also not expected to discern suicidal tendencies where the student has not stated his or her plans or intentions to commit suicide. Even a student's generalized statements about suicidal thoughts or ideation are not enough, given their prevalence in the university community. The duty is not triggered merely by a university's knowledge of a student's suicidal ideation without any stated plans or intentions to act on such thoughts.

As previously explained, this duty hinges on foreseeability. See Irwin, 392 Mass. at 756; Mullins, 389 Mass. at 52. See also Massie, Suicide on Campus, 91 Marq. L. Rev. at 639. Where a student has attempted suicide while enrolled at the university or recently before matriculation, or has stated plans or intentions to commit suicide, suicide is sufficiently foreseeable as the law has defined the term, even for university nonclinicians without medical training. Reliance of the student

per cent of students reported that they had "seriously considered" suicide within the previous twelve months, and 1.5 per cent of students had attempted to commit suicide within the previous twelve months. See American College Health Association National College Health Assessment (2017), at 2, 14, http://www.acha-ncha.org/docs/NCHA-II_SPRING_2017_ REFERENCE_GROUP_EXECUTIVE_SUMMARY.pdf [https://perma.cc/F3NN-U9XD].

on the university for assistance, at least for students living in dormitories or away from their parents or guardians, is also foreseeable. Universities are in the best, if not the only, position to assist. See Mullins, supra. They have also "fostered" expectations, at least for their residential students, that reasonable care will be exercised to protect them from harm. Id. at 52, 54. See Irwin, supra.

The probability of the harm must of course be considered along with its gravity including the death of the student. See Schieszler, 236 F. Supp. 2d at 609 ("there was an imminent probability that [the decedent] would try to hurt himself"); Lake, Still Waiting, 34 J.C. & U.L. at 284 & n.204 (referencing in article on risk of student suicide and violence Justice Learned Hand's United States v. Carroll Towing Co., 159 F.2d 169, 173 [2d Cir. 1947], formulation that "if the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B [is] less than PL"); Eisel v. Board of Educ. of Montgomery County, 324 Md. 376, 386 (1991) (discussing magnitude of harm and statistical possibility of risk of suicide). Thus, where a student has attempted to commit suicide while enrolled at the university or recently before matriculation or stated plans or intentions to commit suicide, that probability is sufficient to justify imposition of a duty on the university. See Eisel,

supra.  The burden on the university is not insubstantial, but so is the financial benefit received from student tuition.  See generally Mullins, 389 Mass. at 53 (relating tuition to duty to provide adequate protection);  Regents, slip op. at 13.  Moral blameworthiness on the part of a university in failing to act to intervene to save a young person's life, when it was within the university's knowledge and power to do so, is understood and accepted by our society.  See Eisel, supra at 391 ("if classmates of [a middle school decedent] found her lying on the floor of a lavatory, bleeding from slashed wrists, and those students told one or more teachers of the emergency, society would be outraged if the teachers did nothing and [the decedent] bled to death"); Ames, Law and Morals, 22 Harv. L. Rev. 97, 112-113 (1908) ("We should all be better satisfied if the man who refuses to throw a rope to a drowning man or to save a helpless child on the railroad track could be punished and be made to compensate the widow of the man drowned and the wounded child").

Reasonable measures by the university to satisfy a triggered duty will include initiating its suicide prevention protocol if the university has developed such a protocol.[18]  In

_____

[18] One resource that provides universities with guidance for drafting is Jed Foundation's Framework for Developing Institutional Protocols For the Acutely Distressed or Suicidal College Student.  See Jed Framework, supra at 2-3, 10-16.

the absence of such a protocol, reasonable measures will require the university employee who learns of the student's suicide attempt or stated plans or intentions to commit suicide to contact the appropriate officials at the university empowered to assist the student in obtaining clinical care from medical professionals or, if the student refuses such care, to notify the student's emergency contact.[19]  In emergency situations, reasonable measures obviously would include contacting police, fire, or emergency medical personnel.  By taking the reasonable measures under the circumstances presented, a university satisfies its duty.

We stress that the duty here, at least for nonclinicians, is limited.[20]  It is created only by actual knowledge of a

---

[19] We recognize that for college and university students the emergency contact will often be the student's parents.  But it might not always be a parent or guardian, such as where the student is married or where the student has informed the University that the suicide attempt or stated plans or intentions to commit suicide derive in part from a toxic home environment (including parental pressures or abuse inflicted by a parent).  See Susan R. Furr, Westefeld, McConnell, & Jenkins, Suicide and Depression Among College Students:  A Decade Later, 32 Prof. Psychol.: Res. & Prac. 97, 98 (2001) (survey of 1,455 college and university students demonstrated that twenty per cent of students who identified themselves as having suicidal thoughts considered "parental problems" to be contributor to their suicidal ideation and behavior).

[20] For university-employed medical professionals, the duty and standards of care are those established by the profession itself.  See Stepakoff v. Kantar, 393 Mass. 836, 841 (1985) ("plaintiff has not directed our attention to any case in which

student's suicide attempt that occurred while enrolled at the university or recently before matriculation, or of a student's stated plans or intentions to commit suicide. It also is limited to initiating the university's suicide prevention protocol, and if the school has no such protocol, arranging for clinical care by trained medical professionals or, if such care is refused, alerting the student's emergency contact. Finally, the duty is time-bound. Medical professionals may, for example, conclude that the student is no longer a suicide risk and no further care or counselling is required.

This limited duty takes a number of the complex and competing considerations discussed above into account. First, it respects the privacy and autonomy of adult students in most circumstances, relying in all but emergency situations on the student's own capacity and desire to seek professional help to

a court has bifurcated the duty owed by a psychiatrist to a suicidal patient by declaring that, when diagnosing a patient, the psychiatrist must exercise the care and skill customarily exercised by an average qualified psychiatrist, while, after diagnosing a patient as suicidal, the psychiatrist's duty to take preventive measures becomes one of 'reasonableness.' We are unwilling to disturb our longstanding rule that a physician, practicing a specialty, owes to his or her patient a duty to comply in all respects with the standard set by the average physician practicing that specialty"). See also McNamara v. Honeyman, 406 Mass 43, 49 (1989), citing Stepakoff, supra at 840 ("psychiatrist must exercise the same degree of skill and care as is exercised by the average qualified practitioner in that specialty, taking into account the advances in that profession and the resources available to the physician").

address his or her mental health issues. Second, it recognizes that nonclinicians cannot be expected to probe or discern suicidal intentions that are not expressly evident. It also acknowledges the scope of the suicide risk on campus and seeks to impose realistic duties and responsibilities on the universities, allowing them to respond with their own suicide prevention protocols if such protocols have been developed. Finally, this limited duty is consistent with the modern university relationship with its students, which is no longer in loco parentis but rather provides for the students' independence and self-determination.

e. <u>Whether a duty was created in this case and, if so, whether a breach of that duty occurred</u>. For reasons that will be explained in detail below, we conclude that there was no duty created in the instant case, and if there arguably was such a duty two years before Nguyen's death, the defendants did not commit a breach of it as a matter of law. In sum, Nguyen never communicated by words or actions to any MIT employee that he had stated plans or intentions to commit suicide, and any prior suicide attempts occurred well over a year before matriculation. He also was a twenty-five year old adult graduate student living off campus, not a young student living in a campus dormitory under daily observation. Nguyen repeatedly made clear that he wanted to keep his mental health issues separate from his

academic performance problems and that he was seeking professional help from psychiatrists and psychologists outside the MIT Mental Health system.

i. The relationship with Dean Randall in 2007. In the instant case, the question whether Randall, and therefore MIT, had a special relationship with Nguyen to take reasonable measures to prevent suicide in 2007 requires consideration of Randall's knowledge of Nguyen's prior suicide attempts and Nguyen's statements about present suicidal thoughts. First, Nguyen's prior suicide attempts in December, 2002, and April, 2005, were as an undergraduate student at a different university and preceded his September, 2006, enrollment as an MIT graduate student. Additionally, although Nguyen had frequent suicidal thoughts, which, in the light most favorable to the plaintiff, can be read as present not past suicidal thoughts, Nguyen denied suicidal ideation in 2007. Thus, Randall had no actual knowledge of Nguyen having attempted suicide while enrolled at or recently before matriculating to MIT, or whether Nguyen had stated plans or intentions to commit suicide. Consequently, Randall had no special relationship with Nguyen and thus no duty to take reasonable measures to prevent Nguyen's suicide two years before his death. Nonetheless, Randall properly encouraged Nguyen to seek professional help at MIT, which Nguyen, as was his right, refused. Nguyen also informed Randall

that he was seeking professional help elsewhere and Randall sought permission to communicate with that psychiatrist, which Nguyen allowed and then promptly revoked.

Finally, Randall invited further conversations with Nguyen, which he declined.  That being said, Randall left Nguyen in the care of competent outside professionals as Nguyen demanded.  In these circumstances, as a matter of law, a twenty-five year old graduate student's rights to privacy, autonomy, and self-determination were properly respected.

ii.  <u>The relationship with Professors Wernerfelt and Prelec</u>.  In contrast to Randall's circumstances, no such special relationship was even arguably created between Nguyen and the defendants Wernerfelt and Prelec.  There was no evidence that Wernerfelt and Prelec had actual knowledge of Nguyen's plans or intentions to commit suicide.  Both were academics; neither was a trained clinician.  Nguyen's communications to them about his mental health problems related to insomnia and test-taking, not to suicidal thoughts.  There was also no evidence that Wernerfelt or Prelec were informed by MIT Mental Health, the student support office, or Randall about Nguyen's two suicide attempts in 2002 and 2005.  Even if Wernerfelt or Prelec had such knowledge, the prior attempts were not close in time to Nguyen's enrollment at MIT.  Given Nguyen's express request that his academic issues be kept separate from his mental health

issues and his assurances that he was being treated elsewhere, there also was no duty to communicate this information to either Wernerfelt or Prelec.  Finally, even though Wernerfelt commented about possible "blood on their hands," it was stated metaphorically in the entirely different context of persuading his colleagues to allow Nguyen to pass his examinations.  We note that Wernerfelt's expressed anxieties at the time of the general examinations that Nguyen might harm himself were not based on express statements or actions by Nguyen or information from trained clinicians and were more than five months before the time of the suicide.  As none of the medical professionals treating Nguyen considered him "imminently suicidal," this was certainly not something Wernerfelt could have intuited on his own.[21]  Because the circumstances at hand did not trigger a

---

[21] Dr. Worthington, who treated Nguyen over the course of forty-three appointments over more than two years, testified that he "never thought [Nguyen] was at that imminent risk [of suicide] that he had to be admitted."  Dr. Jeffrey Fortgang, the last medical professional that Nguyen saw, also noted that Nguyen did not seem "imminently suicidal or hopeless."

Although clinicians commonly assess the "imminence of the risk of suicide," such assessment, even for clinicians, is difficult and disputed.  See, e.g., Hawes, Yaseen, Briggs, & Galynker, The Modular Assessment of Risk for Imminent Suicide (MARIS):  A proof of concept for a multi-informant tool for evaluation of short-term suicide risk, 72 Comprehensive Psychiatry 88 (2017); Simon, Imminent Suicide:  The Illusion of Short-Term Prediction, 36 Suicide and Life-Threatening Behavior 296 (2006).  We do not here in any way impose such assessment on a nonclinician.

special relationship, we need not consider the duty of reasonable care and whether a breach of such a duty occurred.

f.  Voluntary assumption of a duty of care.  The plaintiff also claims the defendants had a duty stemming from their voluntary assumption of a duty of care.  "[A] duty voluntarily assumed must be performed with due care."  Mullins, 389 Mass. at 52.  This duty, however, can lead to liability only where a "failure to exercise such care increases the risk of such harm, or "the harm is suffered because of the other's reliance upon the undertaking."  Id. at 53.  Although MIT voluntarily offers mental health student support services, there is no evidence that these services increased Nguyen's risk of suicide.  Additionally, there was no evidence that Nguyen relied on MIT's mental health services.  The facts bear out Nguyen's rejection of such services.  Nguyen briefly consulted with MIT Mental Health and the student support office for only a few months in 2007, nearly two years before his death.  Nguyen wanted assistance from MIT only as it pertained to test-taking and wanted to keep his mental health treatment separate.  Nguyen declined further MIT services and instead engaged with nine off-campus mental health professionals while remaining enrolled as an MIT graduate student.  Cf. Mullins, supra at 54 (prospective residential students rely on university's security features).  Accordingly, the plaintiff cannot succeed on a "voluntarily

assumed duty" theory.

3. Punitive damages for wrongful death, conscious pain and suffering, and breach of contract. The plaintiff asserts that he is entitled to punitive and emotional distress damages because the defendants' reckless or grossly negligent conduct was the proximate cause of Nguyen's death. As we concluded above, there was no evidence of the defendants' negligence and consequently the plaintiff cannot succeed on such claims. The plaintiff also cannot succeed on his breach of contract claim, as references to MIT Mental Health and the student support office's coordination of services is merely generalized and not sufficient to form an enforceable contract. See Guckenberger v. Boston Univ., 974 F. Supp. 106, 150 (D. Mass. 1997). Further, even if such a contract existed, the claim would still fail, as Nguyen rejected assistance from both MIT Mental Health and the student support office.

4. Motion to amend. The plaintiff contends that his motion to amend the complaint to assert claims against former MIT chancellor Clay should have been allowed. The Superior Court judge denied the motion on grounds of futility.

We review the denial of a motion to amend the complaint for abuse of discretion. Murphy v. I.S.K.Con. of New England, Inc., 409 Mass. 842, 864 (1991), cert. denied, 502 U.S. 865 (1991). Although leave to amend should be "freely given when justice so

requires," Mass. R. Civ. P. 15 (a), 365 Mass. 761 (1974), such leave may be denied where there is undue delay, undue prejudice to the opposing party, or futility in the amendment (citation omitted). Mathis v. Massachusetts Elec. Co., 409 Mass. 256, 264 (1991). Here, Clay, who served as chancellor of MIT from 2001 through 2011, directed efforts in implementing MIT's mental health task force. At the time of Nguyen's death, several key recommendations had not yet been implemented. There was no indication that Clay had any personal knowledge of Nguyen's mental health issues or was personally involved with Nguyen in any other way. Clay had no common-law duty to prevent Nguyen's suicide, nor any special relationship with Nguyen, and he had not voluntarily assumed a duty of care. Furthermore, Clay had no individual liability solely on the basis of his "general supervisory role." Lyon v. Morphew, 424 Mass. 828, 833 (1997). Consequently, the proposed claims against Clay would be futile, and we conclude that there was no abuse of discretion in denying the plaintiff's motion to amend.

5. Workers' compensation. The plaintiff argues that Nguyen was not an MIT employee at the time of his death and consequently his tort claims were not barred by the exclusivity provision of the workers' compensation act, G. L. c. 152. The defendants claim that Nguyen was acting as an MIT employee and the tort claims were barred. We conclude, as did a judge in the

Superior Court in his written decision on cross motions for summary judgment that were filed on this issue, "that there are too many conflicting pieces of material evidence presented for this court to determine, as a matter of law, the unique question of whether or not Nguyen was an MIT employee at the time of his death."  The factual record is undeveloped and unclear and the briefing inadequate on this difficult question involving paid summer research outside of Nguyen's ordinary graduate school activity for which he received a stipend.  Further complicating matters, the financial and other documentary evidence is unclear as to Nguyen's work status at MIT on June 2, 2009. Additionally, whether the June 2, 2009, telephone call prior to the suicide was work or school-related is also in question. Consequently, there was no error in the denial of summary judgment on this issue.  See Maxwell v. AIG Domestic Claims, Inc., 460 Mass. 91, 97 (2011).

Conclusion.  For the foregoing reasons, we conclude that summary judgment was properly granted for the defendants on the tort claims as a matter of law.  We further conclude that the Superior Court judge properly denied summary judgment on the workers' compensation claim, as there are material disputed facts.

So ordered.