FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 4, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 4, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT IN | ) ) ) ) ) |
| | ) |
| MADELEINE BARLOW, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| STATE OF WASHINGTON, d/b/a WASHINGTON STATE UNIVERSITY, | ) ) ) ) |
| Defendant. | ) ) ) |

No. 101045-1

En Banc

Filed: January 4, 2024

JOHNSON, J.—This case involves two questions certified to this court by the United States Court of Appeals for the Ninth Circuit. The first certified question asks whether Washington law recognizes a special relationship between a university and its students, giving rise to a duty to use reasonable care to protect students from foreseeable injury at the hands of other students. The answer to that question is yes, and in the context of the questions presented, that relationship is

defined and anchored in the common law as provided in *Restatement (Second) of Torts* § 344 (Am. L. Inst. 1965). The duty exists where a student is on campus, similar to a business invitee, or involved in university sponsored activities.

The second certified question asks, if yes to the first, what is the measure and scope of that duty? This question asks for the "measure and scope" of the duty, but we do not see any difference between the two words for the purpose of this question and so have spoken to both in the same manner. The answer, as recognized by cases addressing this question, is that the duty exists within the campus confines or university sponsored and controlled events. The scope of the duty is based on a student's enrollment and presence on campus.

## FACTS AND PROCEDURAL HISTORY[1]

Plaintiff Madeleine Barlow moved to the Washington State University (WSU) main campus in Pullman, Washington, in August 2017, to start studies as a freshman. On August 20, 2017, Thomas Culhane, a fellow WSU student, raped Barlow at a party she attended at his off-campus apartment. Culhane was expelled from WSU and was later convicted of second degree rape.

Culhane had been a student at WSU's Vancouver campus until spring semester 2017. While there, WSU received two complaints of sexual misconduct

---

[1] The facts are from the "Order Granting Defendant's Motion for Summary Judgment" from the United States District Court from the Western District of Washington. Excerpts of Rec. at 3-23.

2

against Culhane. One student made a complaint that Culhane sent her sexual comments via electronic communication. Another student reported that while on a university bus for a school trip, Culhane sat next to her and put his hands on and between her legs. He continued even when she told him to stop. The student reported the events to the school, and the Office of Student Conduct conducted a hearing and found Culhane responsible for violating student conduct, under WAC 504-26-221 (sexual misconduct), WAC 504-26-220 (discrimination and discriminatory harassment), WAC 504-26-227 (sexual harassment), WAC 504-26-209 (violation of policy), and WAC 504-26-204 (abuse of others). During the investigation, Culhane requested to transfer to the Pullman campus, which was granted. As a result of the hearing, on August 1, 2017, WSU suspended Culhane for nine days and assigned him to write a paper on his understanding of consent.

On January 28, 2020, Barlow filed suit against WSU in the superior court for Thurston County, bringing a number of claims, including, most relevant for this analysis, a claim for negligence. WSU removed the case to federal court. Barlow's negligence claim rested on WSU having a special relationship with its students, alleging a duty to both control and protect the students, with the knowledge of Culhane's past sexual misconduct making the harm foreseeable.

WSU motioned for summary judgment, arguing that Barlow's claims failed as a matter of law because her injury occurred off campus where the school had no

control and no duty. The district court granted the motion for summary judgment. Barlow appealed to the Ninth Circuit, and that court certified two questions regarding the negligence claim to this court.

CERTIFIED QUESTIONS

The United States Court of Appeals for the Ninth Circuit certified the following questions: (1) "Does Washington law recognize a special relationship between a university and its students giving rise to a duty to use reasonable care to protect students from foreseeable injury at the hands of other students?" and (2) "If the answer to question 1 is yes, what is the measure and scope of that duty?" Ord. Certifying Questions to the Wash. Sup. Ct. at 2 (9th Cir. June 23, 2022).

ANALYSIS

This court may answer a question of law certified from the federal court "if the question of state law is one which has not been clearly determined and does not involve a question determined by reference to the United States Constitution." RAP 16.16(a); *see* RCW 2.60.020. Certified questions are determined de novo. The questions are not considered in the abstract but based on the certified record from the federal court. *Carlsen v. Global Client Sols., LLC*, 171 Wn.2d 486, 493, 256 P.3d 321 (2011).

While the facts establish the context of the underlying case, the certified questions here involve purely legal determinations. The certified questions focus

on duty. The determination of whether a duty exists is a question of law, which is reviewed de novo. *See Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012); *Cummins v. Lewis County*, 156 Wn.2d 844, 852, 133 P.3d 458 (2006). When considering whether a duty exists, this court weighs, "'considerations of logic, common sense, justice, policy, and precedent.'" *Stalter v. State*, 151 Wn.2d 148, 155, 86 P.3d 1159 (2004) (internal quotation marks omitted) (quoting *Keates v. City of Vancouver*, 73 Wn. App. 257, 265, 869 P.2d 88 (1994)). Guiding our determination involves reference to the principles reflected in *Restatement of Torts*.

The general rule is that people and businesses have no duty to aid or protect others from harm. RESTATEMENT (SECOND) OF TORTS § 314. *Restatement (Second) of Torts* § 315 acknowledges the same general rule—that there is no duty to protect others from third-party conduct—but outlines two exceptions, including when a special relationship exists between the actor and the perpetrator or between the actor and the plaintiff/victim.

Barlow argues that such a special relationship exists between students and universities and asks that we expand the common law duty of K-12 schools to universities. She then proposes that we combine two related but distinct duties, based on *Restatement (Second) of Torts* § 315(a) and (b), to establish that WSU had a duty to both protect her and control Culhane. We have never recognized such

5

a special relationship and duty between a university and its students. Rather, the

proper analysis can be found in *Restatement (Second) of Torts* § 344.

Restatement (Second) of Torts § 344 recognizes an exception to the general

rule, relevant here, which the State acknowledges exists:

> A possessor of land who holds it open to the public for entry for his
> business purposes is subject to liability to members of the public
> while they are upon the land for such a purpose, for physical harm
> caused by the accidental, negligent, or intentionally harmful acts of
> third persons or animals, and by the failure of the possessor to
> exercise reasonable care to
>     (a) discover that such acts are being done or are likely to be
> done, or
>     (b) give a warning adequate to enable the visitors to avoid the
> harm, or otherwise to protect them against it.

Under this rule, a university, as a business operator and possessor of land, owes a

duty and would potentially be liable to members of the public, including students,

who are on campus for school related purposes. *Restatement (Second)* § 344

creates a type of special relationship, but the duty is limited to university property

and activities controlled by the university.[2]

Barlow first asks that we apply the duty to protect students established under

our cases between K-12 schools and students, and expand that duty to universities.

Our cases have developed a common law duty and special relationship, with

---

[2] The *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 40 (Am. L. Inst. 2012) also recognizes that all schools, including universities, have a special relationship with their students. However, comment *l* from that section states that "[a]s with the other duties imposed by this Section, it is only applicable to risks that occur while the student is at school or otherwise engaged in school activities."

reference to *Restatement (Second)* § 320, between K-12 schools and their students, but no basis exists to expand that same level of special relationship to universities. The duty of K-12 schools stems from the school's care and custody of the student, the fact that the child must attend school and the relationship is not voluntary, and the protective custody that teachers undertake being a mandatory substitution for that of the parent. *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 319, 255 P.2d 360 (1953). Our cases rely on the nature of the relationship, where K-12 schools have almost complete control over their students and their activities, to establish that duty. K-12 schools generally operate as closed campuses, with the school monitoring closely all who enter the premises. A K-12 school has more ability to exclude members of the public as a safety precaution. Students' time on campus is carefully structured, controlled, and monitored, and they have little choice in class offerings. K-12 schools control their young students and are standing in as parents during the school day, and that control gives rise to the duty that the school owes children. That same control and relationship does not exist in a university setting.

Universities do not have similar protective custody over their adult students. University students are not under the complete control of the university or otherwise dependent in the same way as K-12 students. Universities do not have mandatory attendance. University students have the ability to choose how to spend

their time. The student can decide whether they will attend class in a traditional setting or online. Students choose what classes to enroll in and whether and when to attend. The class hours are often limited, and when not in class, students spend their time as they wish. They can take part in extracurricular activities, work, live independently, marry, take up hobbies, and choose with whom to interact. A university is distinct from a K-12 school, lacking the requisite control over students' decisions.[3]

Barlow proposes that we look to *Restatement (Second)* § 315(b) to establish the special relationship and duty of a university to protect its students. Though we have recognized special relationships and broad liability in some contexts, the cases do not support applying the duty of *Restatement (Second)* § 315(b) to a university. Our cases have identified the nature of a *Restatement (Second)* § 315(b) special relationship giving rise to a duty under limited circumstances. For example, in *Niece v. Elmview Group Home*, 131 Wn.2d 39, 929 P.2d 420 (1997), we held that a group home had a special relationship with a vulnerable adult in its care. Based on the fact that Niece was totally dependent and unable to care for herself, and Elmview was fully responsible for her care, that responsibility gave rise to a

---

[3] *Restatement (Third)* § 40 also acknowledges that the duty owed to elementary-school students is substantially different from that owed to college students. "And because of the wide range of students to which it is applicable, what constitutes reasonable care is contextual—the extent and type of supervision required of young elementary-school pupils is substantially different from reasonable care for college students." RESTATEMENT (THIRD) OF TORTS § 40 cmt. *l.*

duty to protect Niece from a wide array of harms. Elmview's control was critical to applying the duty. That level of control simply does not exist here. Ms. Barlow was not a vulnerable adult lacking the faculties to care for herself. The university had no power to control her decisions or actions away from campus. The existence of a *Restatement (Second)* § 315(b) duty requires control over a vulnerable person's actions, essentially a complete dependence in order to live.

We have more recently explained what creates a "special relationship" and rejected an invitation to broaden the common law duty. In *Turner v. Department of Social & Health Services*, 198 Wn.2d 273, 286-87, 493 P.3d 117 (2021), we stated that *Restatement (Second)* § 315(b) creates a heightened duty to protect someone in a situation where that person is "helpless, totally dependent, or under the complete control of someone else for decisions relating to their safety." The duty is not based on custody but on the dependence of the victim. Where this type of special relationship is formed, it is accompanied by a heightened duty of care to protect the person from any foreseeable harm, equating that duty to strict liability. If the relationship lacks the traits of dependence and control, we held that no liability exists. No similar duty exists between a university and its students under which a *Restatement (Second)* § 315(b) special relationship is implicated.

Barlow emphasizes that the *Restatement (Second)* § 315(b) duty is based on entrustment, that the school was entrusted with her care and she did not assume the

risk of sexual assault when she enrolled in school. She states that failing to recognize the school's responsibility to care for her is essentially victim blaming. We place no blame on Barlow. But a lack of blame on the victim does not establish blame and duty on a third party. The blame lies on Culhane.

As an alternative to *Restatement (Second)* § 315(b), Barlow advances an argument relying on *Restatement (Second)* § 315(a) and *Restatement (Second)* § 319 to advocate for a duty on the part of a university to control Culhane based on what the university knew about him. We disagree. Such a duty does not apply here because of the nature of the relationship between a school and its students.

In *Volk v. DeMeerleer*, 187 Wn.2d 241, 256, 386 P.3d 254 (2016), we said that a *Restatement (Second)* § 315(b) duty of reasonable care exists "on a showing that a definite, established, and continuing relationship exists between the defendant and the third party." We also remarked that in order for a special relation under *Restatement (Second)* § 315(a) to exist, the ability to control the third party must exist. *Volk*, 187 Wn.2d at 264. We then held that a mental health professional and a patient have a special relationship pursuant to *Restatement (Second)* § 315(a), and thus the professional has a duty to take reasonable precautions to help any foreseeable victims. We acknowledged that the nature of the doctor-patient relationship gave the doctor insight into the dangerousness of the patient and provided the doctor with the identity of possible victims, but it also gave the doctor

sufficient control of the third party to manifest the duty. Such a relationship does not exist between a university and its students, where interactions are far less intimate and consistent. Looking at this case, the university did not have sufficient insight into the potential dangerousness of Culhane, the university would not have been able to identify Barlow as a potential victim, and the university could not exercise sufficient control of Culhane to manifest the duty.

In *Volk,* we also expressly rejected a *Restatement (Second)* § 319 duty, and noted the limitations that our prior decisions have placed on a take charge relationship. "As we have interpreted § 319, a take charge duty to act for the benefit of reasonably foreseeable victims exists in certain relationships, including the parole officer/parolee relationship, the probation officer/probationer relationship, and the corrections officer/community custody offender relationship." *Volk*, 187 Wn.2d at 259. *Restatement (Second)* § 319 has not been applied outside of the officer/offender context.

Barlow has cited a number of Washington cases where an officer was found to have a *Restatement (Second)* § 319 duty to the perpetrator's foreseeable victims. *See, e.g.*, *Taggart v. State*, 118 Wn.2d 195, 822 P.2d 243 (1992). Drawing comparisons to cases involving the officer/offender relationship is not helpful here. In those cases, the officer had significant control over the offender, such that the officer could dictate the movement and actions of the offender. Further, the

officers had statutory authority to supervise those in their care, allowing officers to require offenders to report in, to impose conditions on them, and to generally monitor their behavior, a general power to control that a university cannot exercise. The university simply has no authority to dictate the actions of students away from campus.

Ms. Barlow has attempted to establish that based on what WSU knew about Culhane's past behavior, WSU must have had a duty to control him and protect her. She argues that the university had knowledge of his prior bad acts, and thus the negligence of the university was based on the foreseeability that Culhane would do harm again. However, foreseeability does not establish duty. Even if a party knows that a person may commit a crime against another, that party has no duty to act unless a special relationship exists with the victim or the perpetrator. Our cases have recognized such a special relationship in only limited circumstances, none of which apply in the situation presented here, at an off-campus party.

Cases from the California and Massachusetts Supreme Courts are consistent, matching closely to the duty that we recognized in *Restatement (Second)* § 344. Those cases do not support the expansive duty advocated here. In *Helfman v. Northeastern University,* 485 Mass. 308, 149 N.E.3d 758 (2020), the

Massachusetts court did recognize a special relationship between a university and

its students. It stated,

> [W]e conclude that a university has a special relationship with its students, and a corresponding duty to take reasonable measures to protect students from harms associated with alcohol-related emergencies, in the following, narrow circumstances. When a college or university has actual knowledge of conditions that would lead a reasonable person to conclude that a *student on campus is in imminent danger of serious physical harm* due to alcohol intoxication, and so intoxicated that the student is incapable of seeking help for him- or herself, the college or university has a duty to take reasonable measures to protect that student from harm.

*Helfman*, 485 Mass. at 321 (emphasis added). The court also noted that the duty is

limited—it applies only when the university is aware that a student on campus is at

imminent risk, and it requires the university only to act reasonably under the

circumstances, striking an appropriate balance between respecting the student's

autonomy and protecting their physical well-being. The case concludes that the

university had no liability under the facts. This case cannot be read to support

expanding the duty to university students when they engage in off-campus

activities.

Similarly, in *Regents of University of California v. Superior Court*, 4 Cal.

5th 607, 413 P.3d 656, 230 Cal. Rptr. 3d 415 (2018), the court placed the college-

student relationship within the paradigm of a special relationship but again limited

the resulting duty. The court recognized that a duty exists when it comes *to*

*activities that the university sponsors or facilities that it controls*, and the

relationship is limited to enrolled students. In that case, a duty on the part of the university existed where the harm occurred in an on-campus classroom. There, a student was stabbed in class by another student with known violent tendencies.

The court expressly recognized the limit of the special relationship stating, "[W]e conclude postsecondary schools *do* have a special relationship with students while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services." *Regents*, 4 Cal. 5th at 624-25. The court went on to further define the scope of the duty. "The special relationship we now recognize is similarly limited. It extends to activities that are tied to the school's curriculum but not to student behavior over which the university has no significant degree of control." *Regents*, 4 Cal. 5th at 627. The court made clear

> there is generally no duty to protect others from the conduct of third parties. The "special relationship" doctrine is an exception to this general rule. Accordingly, as a consequence of the special relationship recognized here, colleges generally owe a duty to use reasonable care to protect their students from foreseeable acts of violence in the classroom or during curricular activities.

*Regents,* 4 Cal. 5th at 627 (citations omitted). The limitation applies here and is consistent with our cases recognizing the scope of the duty. *See, e.g.*, *Turner*, 198 Wn.2d 273; *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 943 P.2d 286 (1997); *Niece*, 131 Wn.2d 39.

An assertion is made that because a university is involved in aspects of student life outside of the academic sphere, such as providing basic necessities, it is acting as a guardian or in the place of a parent. But the examples of nonacademic offerings noted—on-campus housing, providing food, opportunities for social interaction—generally occur on campus, where a university has potential liability based on *Restatement (Second)* § 344. Also, it is argued that because a code of conduct exists that addresses off-campus behavior, the university is taking measures to control that behavior, and its duty should also extend off campus. We disagree. The code of conduct does not create control of students' behavior in a preventative way. The code may provide the university the ability to academically punish students after the fact, with suspensions, academic probation, or even expulsion. The code of conduct is irrelevant to establishment of a duty.

While sexual assaults are horrific, a university simply has no power to dictate students' movements off campus and away from the oversight of campus security and administration. While a special relationship exists between a university and its students, that duty is to use reasonable care as recognized in *Restatement (Second)* § 344. Because no ability to control off-campus, non-school-sponsored interactions exists, the duty does not extend to the choices or activities under a student's control. A university's duty is limited to where a student is on campus for school related purposes or participating in a school activity.

CONCLUSION

We answer the first certified question, yes, a type of special relationship exists, but that relationship is defined and anchored in *Restatement (Second) of Torts* § 344. The duty exists where a student is on campus, similar to a business invitee. The measure and scope of the duty is based on a student's enrollment and presence on campus or participation in university controlled activities.

 

Johnson, J.

WE CONCUR:

Gordon McCloud, J.

Madsen, J.

Yu, J.

Owens, J.

No. 101045-1

MONTOYA-LEWIS, J. (dissenting)—I disagree with the majority's conclusion that the special relationship between a university and their students is akin to that between a land possessor and its invitees, and therefore exists only when a student is on campus or involved in university sponsored activities. Universities are far "more than mere landlords" to their students; they are stewards of student growth and success and provide a home and a space for students to develop their professional, social, and cultural identities. *Regents of Univ. of Cal. v. Super. Ct.*, 4 Cal. 5th 607, 625, 413 P.3d 656, 230 Cal. Rptr. 3d 415 (2018). I would hold that a university has a special relationship with its students giving rise to a duty to use reasonable care to protect students from foreseeable harm associated with alcohol- and other substance-use-related emergencies, and that such a duty arises when the university has actual knowledge of conditions that would lead a reasonable person to conclude that a student is in danger of serious physical harm. With respect to the measure and scope of such a duty, I would hold that the contours of the duty are shaped by the nature of the relationship and the foreseeability of the danger, so the duty is not confined to the campus borders if the harm is reasonably foreseeable. As

1

a result of these differing conclusions, I dissent.

The legal relationship between a university and its students has steadily evolved with society over the past century. *See* Nathan F. McGuire, *When Does a University Have a Duty To Protect Students from Campus Harms? The Fall of the Bystander Era and the Rise of a Special-Relationship Theory of Duty*, 55 SUFFOLK U. L. REV. 405, 406 (2022). The premises liability approach employed by the majority reduces such a relationship to one that is sterile and transactional and, as such, disregards the significance of historical context in addressing the nature of the relationship. Until the mid-1900s, universities acted in loco parentis ("in the place of a parent")—meaning that schools assumed parental responsibility over their students' lives in a way that surpassed academics and focused on physical safety and moral welfare. *Id.*; Philip Lee, *The Curious Life of In Loco Parentis at American Universities*, 8 HIGHER EDUC. IN REV. 65, 66-67 (2011), https://www.scholar.harvard.edu/files/philip_lee/files/vol8lee.pdf [https://perma.cc/YWW9-798P]. During this time, courts gave great deference to universities to unilaterally discipline and remove students when students acted with "'[o]ffensive habits,'" *John B. Stetson Univ. v. Hunt*, 88 Fla. 510, 516, 102 So. 637 (1924), or in a way that compromised the "moral atmosphere," *Anthony v. Syracuse Univ.*, 231 N.Y.S. 435, 440, 224 A.D. 487 (App. Div. 1928). *See* Lee, *supra*, at 70; *see also* Cori Smith, Comment, *The Civil Rights Approach to University Negligence*

*Liability Arising Out of Student-on-Student Misconduct*, 126 PENN ST. L. REV. 243, 248 (2021).

In the 1960s, with the rise of the civil rights era, university students mobilized against racism and other forms of social injustice and advocated for greater due process rights. *See* Lee, *supra*, at 72. The landmark case *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 151, 159 (5th Cir. 1961), marked the first time a court of appeals held that universities were required to provide students with notice and an opportunity to be heard before expelling them. *Dixon* "signaled that courts were willing to intervene in a university's decision about disciplining its students;" thus, it "opened the door to questions of the extent and contours of a university's duties to its students." Smith, *supra*, at 249; *see also* Peter F. Lake, *The Rise of Duty and the Fall of* in Loco Parentis *and Other Protective Tort Doctrines in Higher Education Law*, 64 MO. L. REV. 1, 3 (1999). As a result of recognizing greater due process protections for students, courts became reluctant to impose a duty to protect students solely on the basis of their enrollment status. *See Dixon*, 294 F.2d at 151; *Soglin v. Kauffman*, 295 F. Supp. 978, 987-88 (W.D. Wis. 1968), *aff'd*, 418 F.2d 163 (7th Cir. 1969); *Knight v. State Bd. of Educ.*, 200 F. Supp. 174, 178-79 (M.D. Tenn. 1961). Yet, these judicial limits on a university's disciplinary jurisdiction over its students gave rise to the question of when a university may be liable for failing to prevent a student's misconduct that harms another student. Smith, *supra*, at 250.

In the decades following, this ultimately led to the "bystander" era for universities, where courts limited university liability for student-on-student misconduct. *See* Robert D. Bickel & Peter F. Lake, *The Emergence of New Paradigms in Student-University Relations: From "In Loco Parentis" to Bystander to Facilitator*, 23 J. OF COLL. & UNIV. L. 755, 780-81 (1997)*; see also Bradshaw v. Rawlings*, 612 F.2d 135, 138-39 (3d Cir. 1979).

Since the late 1990s, the bystander approach has become increasingly rare in cases where a university student harms another student. *See* Lake, *supra*, at 21; *see also* Smith, *supra*, at 251. Over the last three decades, the reality of the frequency of sexual assault and alcohol and substance use in universities has become more understood and addressed by universities and students. *See* DAVID CANTOR ET AL., ASS'N OF AM. UNIVS., REPORT ON THE AAU CAMPUS CLIMATE SURVEY ON SEXUAL ASSAULT AND MISCONDUCT, at vii (2020);[1] *see also* Justine W. Welsh et al., *Substance Use among College Students*, 17 FOCUS 117 (2019), https://focus.psychiatryonline.org/doi/10.1176/appi.focus/20180037. Today's university experience is defined in part by these dangers, as students are required to attend trainings on these risks, universities provide counseling and peer support, and studies identifying these issues are plentiful. We should be responsive to these

---

[1] https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/Revised%20Aggregate%20report%20%20and%20appendices%201-7_(01-16-2020_FINAL).pdf [https://perma.cc/WY2K-MQ3D]

changes and reassess a middle ground between universities operating in a pseudo-parental role and as mere bystanders toward students. *See* McGuire, *supra*, at 409-12.

With such dangers garnering significant public attention and student activists pushing for more stringent measures to protect students against sexual assault, courts have become increasingly open to recognizing a limited tort duty based on a special relationship. *Id.* at 406-12; *see Helfman v. Ne. Univ.*, 485 Mass. 308, 317-18 149 N.E.3d 758 (2020); *Regents*, 4 Cal. 5th at 613, 625-27. After all, the relationship between a university and its students is not limited only to academics but extends also to providing "access to basic necessities such as housing and food, along with the 'social, athletic, and cultural opportunities' that form the foundation of a collegiate 'community.'" *Helfman*, 485 Mass. at 318 (citing *Dzung Duy Nguyen v. Mass. Inst. of Tech.*, 479 Mass. 436, 451, 96 N.E.3d 128 (2018)). With this history in mind, I disagree with the majority that a special relationship exists only within the confines of premises liability under *Restatement (Second) of Torts* § 344 (Am. L. Inst. 1965) (hereinafter § 344).[2] I proceed to analyze the rules around special

---

[2] The COVID-19 pandemic has also shown us that college campuses are not restricted to campus borders. *See generally* Rucha Tulaskar & Markku Turunen, *What Students Want? Experiences, Challenges, & Engagement during Emergency Remote Learning amidst COVID-19 Crisis,* 27 Educ. and Info. Techs. 551 (2021). The concept of what constitutes a university campus has expanded greatly due to classes and activities being held virtually. *See generally id.*; *see also* Karen Swan et al., *Building Knowledge Building Communities: Consistency, Contact and Communication in the Virtual Classroom*, 23 J. Educ. Computing Rsch. 359, 380 (2000) (emphasizing the responsibility to build virtual communities long before the pandemic).

relationships that more precisely reflect this history.

A.     A University's Duty to Its Students

*Restatement (Second) of Torts* § 315 (hereinafter § 315), which has been previously adopted by this court, states that as an exception to the general rule, an institution has a duty to prevent a person from physically harming others when

> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

*See Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992); *see also N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 430, 378 P.3d 162 (2016) (citing *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 43, 929 P.2d 420 (1997)). In other words, an institution has a duty to prevent a person from physically harming others when they have a special relationship with the perpetrator of the harm or a special relationship with the victim of the harm. *See* § 315.

This court has long held that under § 315, K-12 school districts have a duty "to protect their students from the foreseeable risk of harm the students may inflict on each other." *N.L.*, 186 Wn.2d at 430; *Christensen v. Royal Sch. Dist. No. 160,* 156 Wn.2d 62, 67, 124 P.3d 283 (2005); *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 320, 255 P.2d 360 (1953); *Briscoe v. Sch. Dist. No. 123*, 32 Wn.2d 353, 361, 201 P.2d 697 (1949). This duty is based on the foreseeability of the harm and

the school's protective custody over the student. *N.L.*, 186 Wn.2d at 430-31 (citing *McLeod*, 42 Wn.2d at 319).

Moreover, *Restatement (Third) of Torts: Physical and Emotional Harm* § 40(b)(5) (AM. L. INST. 2012) (hereinafter § 40) explicitly recognizes that all schools, including universities, have a special relationship with their students. This special relationship gives rise to "a duty of reasonable care with regard to risks that arise *within the scope of the relationship*." § 40(a) (emphasis added). Comment *l*, further explaining the duty of schools, states that "[t]he relationship between a school and its students parallels aspects of several other special relationships—*it is a custodian of students*, it is a land possessor who opens the premises to a significant public population, and *it acts partially in the place of parents*." (Emphasis added.) The duty of reasonable care is "contextual—the extent and type of supervision required of young elementary-school pupils is substantially different from reasonable care for college students." *Id.*

Consistent with both § 315 and § 40, I would hold that the duty extends to universities and their students. While "[t]he Second Restatement of Torts contained no provision that specifically identified the school-student relationship as special," § 40 specifically recognizes a number of special relationships, including the one between schools and their students. § 40 cmt. *l*. The comments to § 40 illustrate the nature of such special relationships. Comment *l* recognizes that the relationship

7

between a school and its students mirrors defining characteristics of several other special relationships. For instance, schools are more than mere land possessors who open the premises to the public; schools build communities for students and cultivate a culture of holistic growth. *See id.* In turn, schools assume a caretaking function as custodians of students and act partially in the place of parents; schools are trusted with the responsibility of providing a safe environment where such community building and growth can take place. *See id.*

While I agree with the majority that the extent and type of supervision and corresponding reasonable care differs between K-12 school districts and universities, there is nevertheless a special relationship between all schools and their students. *Id.* Indeed, students and, often, their parents invest their financial resources to attend universities with the expectation that "[u]niversities are clearly not bystanders or strangers in regards to their students." *Dzung Duy Nguyen*, 479 Mass. at 450. Rather, university involvement spills into many aspects of student life beyond the academic sphere, including the provision of basic necessities, such as housing, food, and opportunities for interpersonal and cultural development. *See id.* at 450-51; *see also* McGuire, *supra*, at 419-22. Moreover, universities staff campuses with security guards and dorms with resident advisors who are in positions to aid students in danger. *See Helfman,* 485 Mass. at 322 (recognizing universities employ staff who may have knowledge of a student in danger of harm); *see also* McGuire, *supra*, at

422-23. As a result of such efforts by universities, it is foreseeable that students will reasonably rely on the university for assistance, especially those living away from their parents or guardians for the first time. *See Helfman*, 485 Mass. at 320; *Dzung Duy Nguyen*, 479 Mass. at 455. While universities do not take the place of guardians in a one-to-one relationship, they do more than simply offer classes for students to attend. As in the case of Barlow, a student's life at a university can be all encompassing as young people transition to adulthood.

The unique and nuanced nature of the special relationship between a university and their students requires taking a holistic approach when recognizing a tort duty. As a court, we must recognize and change with our increasing understanding of how universities have responded to the crises of sexual assault and alcohol and substance use. Just as we have noted in our juvenile cases, we understand that brain development continues up through about age 25. *E.g.*, *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 319-22, 482 P.3d 276 (2021) (plurality opinion); *see also In re Pers. Restraint of Dodge*, 198 Wn.2d 826, 828-30, 502 P.3d 349 (2022); *State v. Haag*, 198 Wn.2d 309, 320, 495 P.3d 241 (2021); *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015). It is reasonable to apply that knowledge to students who attend universities and to acknowledge that this special relationship should be recognized. While § 315 focuses on a duty turning on "control" or "protection," § 40 comment *l* recognizes that control and protection are

not the only "aspects of several other special relationships" that characterize the relationship between a university and its students. Likewise, § 40(a) considers the duty in proportion to the "risks that arise within the scope of the relationship," creating an opportunity to weigh the specific facts and circumstances of each case.

A university has a special relationship with its students giving rise to a duty to use reasonable care to protect students from certain foreseeable harms. In determining that such a duty exists, the majority acknowledges that we weigh "'"considerations of logic, common sense, justice, policy, and precedent."'" Majority at 5 (quoting *Stalter v. State*, 151 Wn.2d 148, 155, 86 P.3d 1159 (2004) (quoting *Keates v. City of Vancouver*, 73 Wn. App. 257, 265, 869 P.2d 88 (1994))). In my view, this includes (1) the significant shift in knowledge over the last few decades regarding the dangers of sexual assault and alcohol and other substance use at universities, (2) § 315's recognition of a special relationship with the perpetrator and the victim, and (3) the precedent around special relationships based on § 40 and its application to universities and their students in other jurisdictions.

1.    *Shifts in Knowledge Supporting Special Relationship*

The majority's rigid premises liability approach does not comport with the modern reality of university student life. This case would allow us to respond in a timely way to the reality of the prevalence of sexual assault and alcohol and other substance use in universities. According to a recent national study by the

10

Association of American Universities, 13 percent of all university students experience rape or sexual assault. CANTOR, *supra*, at vii. For undergraduate students, 26.4 percent of women, 23.1 percent of transgender, genderqueer, and nonbinary individuals, and 6.9 percent of men experience sexual assault. *Id.* at xi. In the last five years, Washington's six public universities adjudicated at least 492 reports of sexual misconduct. Asia Fields, *Nothing Should Have Happened to Any of Us*, SEATTLE TIMES (Mar. 6, 2022, 6:00 AM).[3] These are just the reported cases, and this does not include the hundreds of reports these universities received but denied for investigation as outside the scope of individual university policies. *Id.* Given that nearly 80 percent of acts of sexual violence go unreported,[4] we can

---

[3] https://www.seattletimes.com/seattle-news/times-watchdog/sexual-assault-case-at-washington-state-university-shows-gaps-in-campus-misconduct-systems-title-ix/. The following is the breakdown of the 492 reported cases by university, from highest to lowest: 186 at Central Washington University, 99 at Eastern Washington University, 75 at the University of Washington, 68 at Washington State University, 40 at Evergreen State College, and 24 at Western Washington University. *Id.*

[4] Numerous studies have demonstrated the underreporting of sexual assaults across the United States. For additional information on this subject, see the Bureau of Justice Statistics at the United States Department of Justice (BJS). For example, the BJS study on rape and sexual assault reporting to police and medical professionals from 1992-2000 found that 26 percent of sexual assaults were reported to the police. CALLIE MARIE RENNISON, BJS, RAPE AND SEXUAL ASSAULT: REPORTING TO POLICE AND MEDICAL ATTENTION, 1992-2000, at 1 (Aug. 2002), https://bjs.ojp.gov/content/pub/pdf/rsarp00.pdf [https://perma.cc/U3LW-57SQ]. Another BJS study on rape and sexual assault victimization among women attending universities from 1995-2013 found that only 20 percent of sexual assaults were reported to the police. SOFI SINOZICH & LYNN LANGTON, BJS, RAPE AND SEXUAL ASSAULT VICTIMIZATION AMONG COLLEGE-AGE FEMALES, 1995-2013, at 1 (2014), https://bjs.ojp.gov/content/pub/pdf/rsavcaf9513.pdf [https://perma.cc/27H9-M5XN]. Additionally, according to another BJS study on women who were victims of sexual assault between 1994-2010, the most common reason for not reporting sexual assaults to the police was fear of reprisal. MICHAEL PLANTY ET AL., BJS, FEMALE VICTIMS OF SEXUAL VIOLENCE, 1994-2010, at 7 (2013), https://bjs.ojp.gov/content/pub/pdf/fvsv9410.pdf [https://perma.cc/E2PL-Z3UK].

extrapolate that these numbers far underreport the actual experiences of students being sexually assaulted while attending universities. *See* Chiara Profenna, *Sexual Assault Often Underreported on College Campuses*, BEACON (Dec. 8, 2021, 11:06 AM).[5]

Moreover, alcohol and other substance use are "strong predictor[s] of an increased risk of committing and experiencing sexual assault among college students." Welsh et al., *supra*, at 119. In fact, "about half of sexual assaults on college campuses involve a situation in which the perpetrator, the victim, or both were consuming alcohol." Md. Collaborative To Reduce Coll. Drinking & Related Problems, *Sexual Assault and Alcohol: What the Research Evidence Tells Us* (2016).[6] In response, many universities have begun providing resources to students, such as providing education and training, physical and mental health services, and self-help suggestions—demonstrating an awareness of the need for intervention. *See, e.g.*, *Compliance and Civil Rights*, WASH. STATE UNIV.;[7] *Sexual Assault Resources*, UNIV. OF WASH.[8]

As we can see in the record, Washington State University requires students to

---

[5] https://www.upbeacon.com/article/2021/12/sexual-assault-often-underreported-on-college-campuses#:~:text=It's%20estimated%20that%20nearly%2080,of%20reporting%20a%20sexual%20assault [https://perma.cc/B5YR-LXJ8]

[6] https://nida.nih.gov/sites/default/files/sexualassault.pdf [https://perma.cc/CA5N-J8EF]

[7] https://ccr.wsu.edu/resources/

[8] https://www.washington.edu/sexualassault/

complete two mandatory trainings: "'Count on Cougs'" and "'eCHECKUP TO GO.'" Def.'s Br. at 53 n.12 (citing *Mandatory Programs*, WASH. STATE UNIV.[9]). "Count on Cougs" is a violence prevention program that seeks to improve campus safety by encouraging bystanders to recognize and act on warning signs and instances of gender-based violence. *Id.* "eCHECKUP TO GO" is an interactive web survey that provides students personalized information about the negative consequences of alcohol consumption. *Id.* The university also has a policy prohibiting discrimination, sexual harassment, and sexual misconduct, which acknowledges that such behavior "destroys mutual respect and a trusting environment, can bring substantial harm to individuals, and violates individual rights." Excerpts of Rec. (ER) at 387. This policy also breaks down investigation procedures, enforcement, and disciplinary sanctions and extends to conduct occurring off campus. Moreover, the university has a code of conduct, which sets out the university's "long-standing commitment to providing students with a holistic learning experience" and requires students to be accountable to the standards of conduct "to foster a safe, healthy, and inclusive campus community." WAC 504-26-001. The university's code of conduct explicitly applies to activities "off university premises and not in connection with university-sponsored activities" where there is an impact on the health or safety of the community or a violation of

---

[9] https://deanofstudents.wsu.edu/health-promotion/mandatory-programs/#count-on-cougs

13

the university's values. WAC 504-26-015(2). Such trainings, policies, and codes of conduct indicate that the university is aware of such dangers and undertakes some reasonable measures to protect students from harm associated with alcohol- and other substance-use-related emergencies. Students reasonably rely on the university for aid in those kinds of emergencies. *See Helfman*, 485 Mass. at 320.

In light of our robust knowledge around the dangers university students are facing and the response by some universities, reducing the relationship to that between a business owner and a business invitee, as the majority opinion does, would excuse universities from accountability and would be inconsonant with the reality of the college experience and universities' roles in students' lives. In declining to find this special relationship, effectively we allow universities to commit to codes of conduct and other requirements of students, but we do not allow those hurt by fellow students to undertake enforcement actions or suits that recognize the very real harm they have experienced. Universities actively engage in supporting students as whole human beings by providing housing, food, cultural and social development, recreation, and physical and mental health services. *See Helfman*, 485 Mass. at 318; *see also Regents*, 4 Cal. 5th at 625 ("Colleges provide academic courses in exchange for a fee, but a college is far more to its students than a business. Residential colleges provide living spaces, but they are more than mere landlords."). This relationship is not akin to that between a business owner and a business invitee,

and our approach should accurately reflect the essence of such a relationship. *See Helfman*, 485 Mass. at 318; *see also Regents*, 4 Cal. 5th at 625.

2. *Special Relationship with the Perpetrator and the Victim*

The majority rejects the existence of the university's special relationship with the perpetrator "because of the nature of the relationship between a school and its students." Majority at 10. Again, I disagree. A special relationship exists with a perpetrator, for instance, "when one takes charge of a third person whom he or she knows or should know is likely to cause bodily harm to another if not controlled, and the actor has a duty to control the third party to prevent him or her from doing such harm." *Bishop v. Miche*, 137 Wn.2d 518, 524, 973 P.2d 465 (1999) (citing RESTATEMENT (SECOND) OF TORTS § 319 (hereinafter § 319)). The majority acknowledges that this "take charge" duty has been recognized in the parole officer/parolee and corrections officer/offender relationships. Majority at 11-12; *see Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 310, 119 P.3d 825 (2005); *Hertog v. City of Seattle*, 138 Wn.2d 265, 284, 979 P.2d 400 (1999); *Taggart*, 118 Wn.2d at 217.

However, the majority concludes that this duty is inapplicable in this instance because the relationship between the university and a student perpetrator is incomparable to that between an officer and an offender due to insufficient control. I disagree. I would recognize a special relationship with the student perpetrator where the duty to take reasonable care is proportional to the university's degree of

15

custody and control. Particularly I would do so where, as here, the university has identified someone as a risk for harming other students, intervened, and understood him to be a continuing threat.

If we look closely at the "take charge" doctrine, it is clear that it should apply in a case like this. In *Taggart*, the "take charge" duty between parole officers and parolees was characterized by the parole officers' ability to keep watch on the parolees' compliance with release conditions and overall progress, as well as the knowledge of the parolees' criminal histories. 118 Wn.2d at 219-20. Through such observations and knowledge, when a parolee's criminal history and behavior indicate that it is reasonably foreseeable that they will inflict injury on others, the parole officer has a duty to exercise reasonable care to control the parolee. *Id.* at 220. Although a university does not control students the same way a parole officer controls a parolee, universities do have control over students, as evidenced by their power to enforce student conduct policies and impose disciplinary sanctions for violating such policies. *See* Def.'s Br. at 53 n.12; ER at 387; *supra* at 12-13 (noting the university's policy prohibiting sexual assault and two mandatory trainings to prevent violence and the negative consequences of alcohol consumption); *cf. N.L.*, 186 Wn.2d at 427, 430 (where the court found it significant that the school knew the student perpetrator posed a risk and had some level of control over him). In this case, the university imposed sanctions and monitored Culhane's compliance with

them before, during, and after the assault on Barlow. *See* Ord. Certifying Questions to the Wash. Sup. Ct. (Order) at 6.

Moreover, a "take charge" duty turns on knowledge of the likelihood that a perpetrator will cause bodily harm to another. *See* § 319. In *Taggart*, the "take charge" duty was characterized by the knowledge of the perpetrator's criminal history and the ability to keep watch on their progress. 118 Wn.2d at 219-20. Similarly, once a university has actual knowledge of the risk a student poses to other students, it has the ability to keep watch on that student's progress and intervene when necessary, exactly as the university did here. Here, the university had actual knowledge of the perpetrator's multiple instances of sexual misconduct and his apparent confusion regarding the concept of consent. *Cf. N.L.*, 186 Wn.2d at 427, 430. Namely, Culhane demonstrated that he did not understand the concept of consent, particularly where a person lacks the mental capacity to consent. Order at 6. The university required him to write a reflection paper as part of his sanctions for his prior sexual misconduct. *Id.* The university knew he continued to misunderstand consent, and instructed him to rewrite the paper. *Id.* But it appears he never completed all the terms of his sanctions. *Id.*; *see* ER at 57-58. Two weeks after the sanctions were imposed, Culhane raped Barlow. Order at 6. Since this occurred two weeks after his student conduct officer rejected his paper about consent because he failed to understand the concept, I find it hard to conclude that his actions were

17

not predictable. *See id.* I would hold that the university's actual knowledge of Culhane's dangerous propensities triggered the duty to "take charge" of him—to take steps to prevent him from assaulting other students (or, at a minimum, warn students of the risk he presented).

Apart from the "take charge" duty, this court has found that a special relationship exists when the nature of the relationship "warrants social recognition." *Volk v. DeMeerleer*, 187 Wn.2d 241, 258, 386 P.3d 254 (2016). In *Volk*, a psychiatrist's former client killed two people and attempted to kill a third after expressing suicidal and homicidal ideations to the psychiatrist. *Id.* at 246. Though the court declined to analyze the duty there as a "take charge" duty, it held that the psychiatrist and her former client had a special relationship due to a doctor's "unique insight into the potential dangerousness" of a patient as well as a doctor's professional knowledge, giving rise to a duty to protect the client's foreseeable victims from their conduct. *Id.* at 261-66.

The university asserts that it does "not share an intimate doctor/patient relationship with each and *every one of its students*, giving it the same insight into their potential dangerousness or their foreseeable victims." Def.'s Br. at 31-32 (emphasis added). The majority agrees. Majority at 10-11. Though they are correct that it would be unreasonable to expect an institution with thousands or tens of thousands of students to have an intimate relationship, akin to that of a doctor and

18

patient, with *every one* of its students, it is reasonable to expect a university to foster an intimate relationship with *particular* students, specifically, students that pose risks of harm to other students that are known to the university. *See Helfman*, 485 Mass. at 321. For instance, if a faculty member approaches a university administrator to express a concern about a particular student posing a danger to other students, with that knowledge, it is reasonable to expect the university to actively take steps to prevent the potential perpetrator from inflicting harm on other students.

In my view, such a duty increases with knowledge because it strengthens the relationship between the university and the student, as well as the level of control the university has over the student. *See* § 40. For example, if a university learns of a student posing reasonably foreseeable danger to other students and requires the student to attend therapy, the university should confirm that the student is actually attending therapy. This knowledge of the risk the student poses is the university's *unique* opportunity to mitigate the risk of harm by providing support to work through their behavior. The student may be expressing, either directly or indirectly, a need for help, and the university should respond either with more supervision or services.[10] *See, e.g.*, *Helfman*, 485 Mass. at 320 (finding that university undertaking

---

[10] The university alleges that the imposition of a special relationship under § 315(a) may detract from restorative justice efforts. Def.'s Br. at 36. "Restorative justice is best understood as a relational theory of justice." Jennifer Llewellyn et al., *Imagining Success for a Restorative Approach to Justice: Implications for Measurement and Evaluation*, 36 DALHOUSIE L.J. 281, 295 (2013). For millennia, Indigenous peoples have been practicing restorative justice as a community effort, and they recognize that "'justice involves far more than what you do after things have gone

responsibilities to provide medical amnesty for students engaged in underage drinking leads to reasonable reliance on university to assist in the event of such emergency).

Here, again, the university knew of Culhane's multiple instances of sexual misconduct and required him to work with a student conduct officer in hopes of bringing the misconduct to a halt. In the process, the university learned that Culhane continued to misunderstand the concept of consent, yet it still allowed him to transfer to the Pullman campus. In doing so, the university created a risky situation by allowing Culhane to become a part of that campus community while an active disciplinary case was open against him. *See* ER at 87 (student victim of Culhane's prior sexual misconduct warned university investigator that Culhane should not be

---

wrong . . . instead it involves creating the social conditions that minimize such wrongdoing.'" *Indigenous Roots of Restorative Justice*, BRATTLEBORO CMTY. JUST. CTR. (Oct. 16, 2019) (alteration in original) (quoting MAY LEUNG, THE ORIGINS OF RESTORATIVE JUSTICE (Apr. 4, 2001), https://cfcj-fcjc.org/sites/default/files/docs/hosted/17445-restorative_justice.pdf) http://www.brattleborocjc.org/blog/indigenous-roots-of-restorative-justice [https://perma.cc/VZ4E-ELYF]. Relatedly, Diné people have long approached restorative justice through the lens of "K'e," meaning respect— "'to restore my dignity, to restore my worthiness.'" *Id.* (quoting Laura Mirsky, *Restorative Justice Practices of Native American, First Nation and Other Indigenous People of North America: Part One* (Apr. 27, 2004), https://www.iirp.edu/images/pdf/natjust1.pdf). Recognizing a special relationship between a university and student perpetrators does not unravel restorative justice efforts. In fact, if a victim student and/or other students from the university community want to engage in a restorative justice approach (e.g., a mediated conversation with the student perpetrator, community circling, etc.), this may be an appropriate way for the university to intervene so long as the victim student is both willing and comfortable with that approach. Such a special relationship could help to establish the social conditions that minimize harm to begin with, and could create opportunities for students at risk of perpetrating sexual assault to restore and repair. While the term "restorative justice" has become significantly attenuated from its roots in tribal customary law and practices, communities like universities could benefit from such practices both to address harm that has already been caused and to prevent it.

allowed to transfer to a campus "where there are dorms [and] more access to alcohol"). Such knowledge of the risks Culhane posed to other students strengthened the relationship between him and the university, as well as the level of control the university had over him to provide support and intervention. *See* ER at 4-5; Order at 6 (university received two complaints about Culhane, held a conduct hearing, suspended him, ordered him to write and re-write a reflection paper, and expelled him). This is precisely the kind of special relationship with a student perpetrator that ought to give rise to a duty. *See Volk*, 187 Wn.2d at 261-66.

The majority likewise rejects the existence of the university's special relationship with the victim, determining that such a "duty requires control over a vulnerable person's actions, essentially a complete dependence in order to live." Majority at 9. But this court has routinely recognized that the foundation of a special protective relationship under § 315(b) is based on "entrustment for the protection of a vulnerable victim," not complete dependence. *H.B.H. v. State*, 192 Wn.2d 154, 173, 178, 429 P.3d 484 (2018) (citing *Niece*, 131 Wn.2d at 50); *see C.J.C. v. Corp. of Cath. Bishop of Yakima*, 138 Wn.2d 699, 721-22, 725-26, 985 P.2d 262 (1999).[11]

---

[11] The majority mentions that this court examined whether and when a § 315(b) duty arises in *Turner v. Department of Social & Health Services*, 198 Wn.2d 273, 276, 493 P.3d 117 (2021). Majority at 9. But that case is distinguishable. There, plaintiff sued the Department of Social and Health Services for negligence for allowing her husband to be placed in independent living despite having multiple sclerosis, which had caused general functional limitations. He later died in a fire in his independent living apartment. *Id.* at 276-77, 282. This court found that there was no special relationship between the department and the plaintiff's husband because he made the decision to transition from a nursing home to living in an independent apartment and, in doing so, "he accepted

We have yet to define a "vulnerable victim," and I would be loath to do so because doing so necessarily reinforces the idea that a victim has some responsibility for their assault. That is categorically incorrect. As a result, our focus should not be on the age of the university student but rather on the situation in which they find themselves.

This court has long held that K-12 school districts have a special protective relationship with their students and some of this is instructive here. *McLeod*, 42 Wn.2d at 320. In *N.L.*, a 14 year old student was raped by an 18 year old student. 186 Wn.2d at 425-26. The students were at track practice together when they met, exchanged phone numbers, and began texting. *Id.* at 426. The school principal was aware that the student perpetrator was a registered sex offender but did not inform teachers or coaches, and the student was permitted to mentor younger students on the track team. *Id.* at 427. The student perpetrator invited the student victim to lunch; she agreed, and when they skipped track practice, he drove her to his house where he raped her. *Id.* at 426. Even though the injury took place off campus, this court noted that it was not unforeseeable that students would leave campus together and held that a special protective relationship existed between the student victim and the school district. *Id.* at 426, 436.

---

certain risks." *Id.* at 276, 290. Here, Barlow's decision to attend the university is not in dispute; instead, this case is about the duty to use reasonable care to keep students safe from third parties—student perpetrators.

The majority's conclusion that the university does not have a special protective relationship with Barlow because she "was not a vulnerable adult lacking the faculties to care for herself" fails to take into account the complex nature of sexual assault and the manner in which perpetrators identify, manipulate, and attack their victims. Majority at 9. That said, the assertion that Barlow should be considered an adult not in need of protection at 18 years old is defeated by modern neurological science. Studies on young people's brain development indicate that "biological and psychological development continues into the early twenties, well beyond the age of majority." Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641, 642 (2016); *see also* Kathryn Monahan et al., *Juvenile Justice Policy and Practice: A Developmental Perspective*, 44 CRIME & JUST. 577, 582 (2015); Alexandra O. Cohen et al., *When Does a Juvenile Become an Adult? Implications for Law and Policy*, 88 TEMPLE L. REV. 769, 786 (2016). Indeed, this court has recently issued a series of opinions recognizing that given such insights in modern neurological science, the age of majority is inherently and necessarily "flexible" in the context of juvenile justice. *E.g.*, *Monschke*, 197 Wn.2d at 319-22; *see also Dodge*, 198 Wn.2d at 828-30; *Haag*, 198 Wn.2d at 320; *O'Dell*, 183 Wn.2d at 695. As Washington law has already recognized that a young person's brain continues to develop into their early 20s, I would also recognize that university

23

students in that developmental stage should be under some protection of their universities. Many students, like Barlow, are living away from home and parental supervision for the first time. In Barlow's case, she was 18 years old and had only been on campus for a few days before being raped. Just a few months prior, as a high school senior, Barlow would have been protected by the special relationship with the school district. I would find it imperative that Washington tort law reflects modern neurological science.

I would also focus this approach on the behavior of the perpetrator, rather than the status of the victim. Modern student development theory does not isolate developmental stages by age. SUZANNE DEGGES-WHITE & CHRISTINE BORZUMATO-GAINEY, COLLEGE STUDENT MENTAL HEALTH COUNSELING: A DEVELOPMENTAL PERSPECTIVE 8 (2013). Rather, it studies the stages of development as students (whether traditional or not) begin and move through higher education. While the victim in this case was an 18 year old student with little exposure to college life, I would not limit such a doctrine to those under a certain age. Rather, I would focus on the relationship of the university to a person they know to be a threat.[12]

---

[12] This footnote represents my own personal experience as a faculty member and does not and cannot be attributed to any other signatory to this dissent. Due to the importance of the issue, I am compelled to include this brief narrative as it is instructive and informative of the overall approach I believe is necessary to resolve this case. As a former faculty member at Western Washington University, I heard from multiple students about other students who had attempted or completed sexual assaults on campus. Most of the time, the victim did not want to report what happened to them, and they did not want me to do so either. But when they did ask me to intervene, both times I was told by administrators at the university that absent a direct report from a student

Moreover, many university students, like Barlow, are also vulnerable due to the prevalence of alcohol and other substances embedded into the university experience. Barlow had very little experience with alcohol, and after consuming between 9 and 12 drinks, she was intoxicated to the point at which she was struggling to stand and speak. A student in this situation may be particularly vulnerable, regardless of age. *See Helfman*, 485 Mass. at 318-21 (Intoxication does not preclude the existence of a special relationship, and universities recognize these foreseeable risks and take reasonable steps to protect students in the event of an alcohol-related emergency.).

Thus, I would conclude that under § 315, a university has a special relationship with both student victims and students known to be potential perpetrators that gives rise to a duty to protect other students from the potential perpetrators' conduct. I would limit this inquiry, however, and primarily focus on the actions of the university as it applies to the perpetrator.

3.    *Shifts in the Law Supporting Special Relationship*

The majority concludes that cases from the California and Massachusetts Supreme Courts are consistent with the duty recognized in § 344 and do not support the duty recognized in § 315 and § 40. Majority at 12. I disagree. The finding of a

---

or a witness, they would not intervene. This seems to me to be a fundamental failure of the university to protect students from a known danger, particularly when there are multiple reports about the same alleged perpetrator as was the case when several students so reported to me.

special relationship beyond that of a mere land possessor and invitee is not only compelled by "'considerations of logic, common sense, justice, policy, and precedent,'" *Stalter*, 151 Wn.2d at 155 (internal quotation marks omitted) (quoting *Keates*, 73 Wn. App. at 265), but it is also consistent with the approach modern courts have taken. *See, e.g.*, *Helfman*, 485 Mass. at 317-18; *Regents*, 4 Cal. 5th at 613, 625-27. This consistency matters because the law should comport with reality, and today's university experience is defined in part by the dangers of sexual assault and alcohol and other substance use. *See* McGuire, *supra*, at 409-12. In my view, it is detrimental to not acknowledge the nuanced nature of the relationship between a university and its students as stewards of student growth and success in the face of such known dangers.

In recent years, courts have begun to recognize a special relationship in the university context. As discussed above, the *Restatement (Third) of Torts* recognizes that all schools, including universities, have a special relationship with their students that gives rise to "a duty of reasonable care with regard to risks that arise *within the scope of the relationship*." § 40 (emphasis added). The California and Massachusetts Supreme Courts have led the way in adopting an approach modeled after the *Restatement (Third) of Torts*. *Helfman*, 485 Mass. at 317-18; *Regents*, 4 Cal. 5th at 613, 625-27.

The majority focuses on *Regents* and *Helfman* solely for purposes of limiting

26

the scope of the duty to activities on campus or those that are university sponsored. Majority at 12-15. But there was no occasion to analyze the duty beyond the campus borders in those cases because both of the injuries occurred on campus. *See Regents*, 4 Cal. 5th at 613; *see also Helfman*, 485 Mass. at 309-10. Moreover, the courts told us far more about the nature of the relationship between a university and its students in modern day society than the majority acknowledges.[13]

In *Helfman*, where a university student allegedly sexually assaulted another student in the dorms, the Massachusetts Supreme Court held that there is a special duty between a university and its students, but that duty is triggered only when it is reasonably foreseeable that the plaintiff would suffer a criminal act by a third party or other physical harm due to her intoxication. 485 Mass. at 309-10, 315. The court acknowledged that the duty was rooted in the "'distinctive relationship between colleges and their students,'" which includes both students' reasonable expectations that the university will take reasonable care to protect them from foreseeable harm, and the general voluntary undertaking by universities to protect students from criminal acts by third parties. *Id.* at 316. (quoting *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 56, 499 N.E.2d 331 (1983)). It also concluded that voluntary intoxication

---

[13] For instance, in *Regents*, the court told us that "colleges provide a discrete *community* for their students," and "[a]lthough college students may no longer be minors under the law, they may still be learning how to navigate the world as adults." 4 Cal. 5th at 625. As a result, students "are dependent on their college communities to provide structure, guidance, and a safe learning environment," and, as such, the colleges "have superior control over the environment and the ability to protect students." *Id.*

did not extinguish the special relationship because "the contemporary paradigm of the university-student relationship recognizes that students' 'right to privacy and their desire for independence may conflict with their immaturity and need for protection.'" *Id.* at 316-18 (quoting *Dzung Duy Nguyen*, 479 Mass. at 451-52). Consequently, the court determined that the dangers associated with voluntary intoxication were foreseeable risks, and, as universities have taken reasonable measures to protect students in alcohol-related emergencies, it was foreseeable that a student would reasonably rely on the university for aid in the event of an alcohol-related emergency. *Id.* at 319-20.

Ultimately, the court held that "a university has a special relationship with its students, and a corresponding duty to take reasonable measures to protect students from harms associated with alcohol-related emergencies," which extends to circumstances where the "university has actual knowledge of conditions that would lead a reasonable person to conclude that a student on campus is in imminent danger of serious physical harm due to alcohol intoxication, and so intoxicated that the student is incapable of seeking help for him- or herself." *Id.* at 321. Thus, the university had a special relationship giving rise to a duty to protect students, limited to foreseeable harms.

I would adopt a rule similar to Massachusetts and hold that a university has a special relationship with its students giving rise to a duty to use reasonable care to

protect students from foreseeable harm associated with alcohol- and other substance-use-related[14] emergencies. That rule, however, is too limited and focuses solely on the victim. As discussed above, I would also focus on the university's knowledge of the perpetrator. Namely, a duty arises when the university has actual knowledge of conditions that would lead a reasonable person to conclude that a student is in danger of serious physical harm. Similar to the special relationship K-12 school districts have with its students, universities have a special relationship with students when they have custody and control over students. *N.L.*, 186 Wn.2d at 430. "[W]hat constitutes reasonable care is contextual." § 40 cmt. *l*. While the degree of custody and control may differ in a university context, the special relationship nevertheless exists.

### B. Measure and Scope of Duty

The majority holds that the duty is limited to "the campus confines or university sponsored and controlled events." Majority at 2. I disagree with such a limitation. I would hold that the measure and scope of the duty extends to reasonably foreseeable harms to currently enrolled students, which are not limited to the four corners of campus so long as the harm was reasonably foreseeable. The harm may

---

[14] I would include in this duty such foreseeable harms associated with both alcohol- and other substance-use-related emergencies because over the last decade, "college campuses have witnessed a national increase of cannabis, stimulant, and illicit drug use among students." *See* Welsh et al., *supra*, at 117. Research shows that this substance use is associated with an increased risk of committing and experiencing sexual assault. *Id.*

be particularly foreseeable if prescribed by the university's code of conduct.

As discussed above, under § 315, a special relationship giving rise to a duty to students turns on control and entrustment of care. *See, e.g.*, *Taggart*, 118 Wn.2d at 217 (control); *H.B.H.*, 192 Wn.2d at 173 (entrustment of care) (citing *Niece*, 131 Wn.2d at 50). Control is characterized by the knowledge of a perpetrator's history and ability to keep watch on their progress. *Taggart*, 118 Wn.2d at 219-20. Entrustment of care is characterized by an "'assumption of responsibility for the safety of another,'" not physical custody. *H.B.H.*, 192 Wn.2d at 173 (quoting *Niece*, 131 Wn.2d at 46).

Neither a student victim's entrustment to a university's care nor a university's requisite ability to control the foreseeable conduct of a student perpetrator is confined to the four corners of campus. Universities create a "discrete *community* for their students" and therefore have a responsibility to protect those communities. *Regents*, 4 Cal. 5th at 625. Community is not just a physical space—it is relationships, connection, shared interests and values. "Although college students may no longer be minors under the law, they may still be learning how to navigate the world as adults" and rely on their university communities for safety and guidance; thus, universities "have *superior control* over the environment and the ability to protect students." *Id.* (emphasis added).

We have already recognized that a school's duty to its students is not limited

to the four corners of campus in *N.L.*, 186 Wn.2d at 435. *Even though the rape took place off campus* when students skipped track practice, we held that "[w]hile the location of the injury is relevant to many elements of the tort, the mere fact the injury occurs off campus is not by itself determinative." *Id.* at 426, 435. The court reasoned that "'[f]oreseeability is the most important variable in the duty calculus,'" rather than the location of the injury itself, and it was not unforeseeable as a matter of law that students would leave campus together. *Id.* at 434-36 (quoting *Eisel v. Bd. of Educ.*, 324 Md. 376, 386, 597 A.2d 447 (1991) (holding that a school district had a duty to a student who died by suicide off campus on a school holiday where the student's friends reported the suicidal ideations to officials and officials failed to take any other action)); *see also Hoyem v. Manhattan Beach City Sch. Dist.,* 22 Cal.3d 508, 515, 520, 585 P.2d 851 (1978) (holding that a school district had a duty to a student who was injured by a motorcycle off campus where the school failed to supervise the student and he wandered off). Consequently, I would find that the rule is one of foreseeability rather than location.

Foreseeability is just as crucial a variable in the duty calculus in the university context. Foreseeability flows from the responsibility assumed by a university and an evaluation of the factual circumstances. *See, e.g.*, *Niece*, 131 Wn.2d at 50-51 (sexual abuse by staff at a residential care facility may be foreseeable based, in part, on facility's policies against unsupervised contact with residents). For instance,

31

when a university's code of conduct extends off campus, the university's corresponding self-imposed responsibility to students follows. Wherever a university requires its students to comply with the code of conduct, it should foresee that students rely on the university to enforce it. *See* ER at 4-5 (another student victim relied on the university to discipline Culhane for his off-campus sexual misconduct). The majority states that "[t]he code of conduct is irrelevant to establishment of a duty." Majority at 15. I disagree.

Recently, the Ninth Circuit recognized that a school's Title IX duty to its students is not limited to the four corners of campus where a university maintains control over that context, for instance, through a code of conduct. *Brown v. Arizona*, 82 F.4th 863, 874-80 (9th Cir. 2023). The majority does not acknowledge that case. There, a student athlete assaulted three students off campus. *Id.* at 866. The university knew about the student perpetrator's history of assaults on two of those students and did not take any steps to protect the third student from harm. *Id.* at 866-67. The third student victim sued the university under Title IX, and the court found a genuine issue of material fact on the university's liability because it had sufficient control over the student perpetrator and the "context" in which the assault occurred. *Id.* at 866, 875. A university has control over the context of the assault when the student perpetrator "'is under the school's disciplinary authority.'" *Id.* at 875 (emphasis omitted) (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629,

32

647, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)). If the conduct occurs in this context—one where the university has sufficient oversight over the perpetrator and university officials knew the perpetrator was likely to commit certain conduct—the university has substantial control and may be held liable for deliberate indifference under Title IX even where the conduct takes place off campus. *Id.* at 866-67 (citing *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 688 (4th Cir. 2018) (holding that a university has substantial control over an off-campus context when it has some ability to identify the student perpetrators and the ability to take action to prevent the conduct from occurring)). Like the university here, that university had a student code of conduct that extended off campus because of the belief that misconduct, regardless of the location, impacts student health, safety, and security and should be prevented from happening. *Id.* at 878. Some element of "'school sanction, sponsorship, or connection to a school function is required'" for a school to control an off-campus context, and the court found that the university's code of conduct created such a connection. *Id.*

Here, the university, through its code of conduct, assumes a responsibility "to foster a safe, healthy, and inclusive campus community" and requires students to read and be familiar with the standards of conduct and to abide by them under penalty of educational sanctions. WAC 504-26-001. The university's code of conduct explicitly applies not only to activities on campus but also "to conduct that

33

occurs *off university premises* and *not in connection with university-sponsored activities*, if the conduct adversely affects the health and/or safety of the university community or the pursuit of the university's vision, mission, or values." WAC 504-26-015(2) (emphasis added). Similar to *Brown*, this rule creates a connection to an off-campus context that establishes sufficient control by the university. 82 F.4th at 878. Other higher education institutions in Washington maintain similar codes of conduct that apply to off-campus activities. *E.g.*, WAC 106-125-005 (Central Washington University); WAC 172-121-040 (Eastern Washington University); WAC 174-123-150 (Evergreen State College); WAC 478-121-040 (University of Washington); WAC 516-21-030 (Western Washington University). Universities cannot impose a code of conduct that applies to off-campus activities and then wash their proverbial hands of those activities when the university's liability comes into question.[15]

I would find that the duty encompasses an injury such as the rape in this case. Sexual assault gravely affects the safety of the university community and the pursuit of the university's long-standing values to provide a safe, healthy, and inclusive experience for students; thus, it is precisely the type of conduct contemplated by the code of conduct and a kind of harm the university is responsible for protecting

---

[15] I would not hold that codes of conduct alone create liability or a duty to act; rather, I would hold that the existence of these codes underscores the university's recognition of its authority to control off-campus behavior.

students from based on the special relationship. *See* § 40. Moreover, this danger was foreseeable. Barlow was raped by a student about whom the university had actual knowledge of two prior instances of sexual misconduct against other students. Yet, the university, despite warning by one of the student victims, allowed Culhane to transfer to the Pullman campus, where there was access to dorms and greater access to alcohol. ER at 87. The university required Culhane to work with a student conduct officer, tested his understanding of consent, and found he continued to misunderstand how a person may lack the mental capacity to consent. Just two weeks later, Culhane raped Barlow, when she was incapacitated by alcohol.

The mere fact that Culhane raped Barlow at a party off campus is not by itself determinative. *See N.L.*, 186 Wn.2d at 435; *see also* ER at 4 (the university previously disciplined Culhane for off-campus sexual misconduct during a student recreational trip). Rather, foreseeability is determinative, *N.L.*, 186 Wn.2d at 434-36, and it was foreseeable that Culhane would sexually assault another student under these circumstances. Relatedly, sufficient control over the context of the assault is determinative, and the university had sufficient control over Culhane because he was subject to the university's heightened disciplinary authority given his prior misconduct. *Brown*, 82 F.4th at 875-76. The university had sufficient oversight and actual knowledge of the danger Culhane posed and had a duty to protect Barlow—a freshman who had been on campus just a few days and was dangerously

35

intoxicated—from foreseeable harm. Accordingly, since the university had a relationship with both students and the danger was reasonably foreseeable based on what it knew about Culhane's dangerous propensities, the university had a duty to control Culhane's conduct and protect Barlow from harm even though the assault took place off campus.

In sum, universities are far from mere bystanders or landlords when it comes to their students. Rather, students attend universities with reasonable expectations of attaining far more than a degree—universities build communities where students seek a sense of purpose, belonging, and, at a minimum, safety. Given the realities of modern university life and the law of special relationships, I would answer the certified questions as follows: First, I would hold that a university has a special relationship with student perpetrators and student victims giving rise to a duty to use reasonable care to protect students from foreseeable harm associated with alcohol- and other substance-use-related emergencies. Second, I would hold that the duty extends to currently enrolled students beyond the four corners of campus so long as the harm was reasonably foreseeable, particularly if prescribed by the university's code of conduct. Accordingly, I would find that the university had a special relationship with both Barlow and Culhane, which gave rise to a duty that extended to this foreseeable harm at an off-campus party.

I respectfully dissent.

_____
Montoya-Lewis, J.

_____
González, C.J.

No. 101045-1

STEPHENS, J. (concurring in dissent)—I agree with the dissent that a university's duty to use reasonable care to protect students from foreseeable injury at the hands of other students arises from the special relationship between the university and its students. That relationship is not defined by the geographical boundaries of a particular college campus, and the duty is therefore independent of premises liability. In the context of this case, that duty arises from both the relationship between Washington State University (WSU) and Thomas Culhane and the relationship between WSU and Barlow. *See* RESTATEMENT (SECOND) OF TORTS § 315(a) (AM. L. INST. 1965).

With respect to the special relationship between WSU and Culhane, a duty to exercise reasonable care arises when a university knows or should know that a student perpetrator of harm who is currently subject to university discipline is likely to cause harm to others if not controlled. *See id.* § 319. The measure and scope of the university's duty to use reasonable care is limited by the scope of its undertaking

and the foreseeability of harm.  Contrary to the majority's exaggerated concerns, this "take charge" duty is not limitless.

With respect to the relationship between WSU and Barlow, a duty to exercise reasonable care arises with respect to foreseeable harms that a university knows or should know a student in its community is likely to encounter.  *See* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 40 (AM. L. INST. 2012).  Again, the scope of this duty is bounded by the extent of the undertaking and is not limitless.  The majority seems to doubt the ability of courts to define the boundaries of reasonableness in the context of a particular scenario, as it posits two extremes—either no duty or total control.  As the dissent correctly recognizes, the world is more nuanced than that.  Categorical thinking denies the genius of the common law.

I write separately to highlight that the certified questions do not require us to opine on liability and that it should be left to the trier of fact to determine the standard of care owed by WSU and whether the university breached its duty.  In my view, portions of the dissent's analysis drift into the province of the jury.  For example, though modern brain science certainly demonstrates that an 18-year-old's brain is still developing and while alcohol and drugs pervade university campuses, the extent to which these circumstances affect the vulnerability of a student victim and questions of factual foreseeability fall within the purview of the jury.  Dissent at 22-

24. Similarly, the university's actual knowledge of the particular risks posed by Culhane in light of his prior conduct is a question for the jury. *Id.* at 34-35.

Additionally, I agree that a code of conduct can contextualize the scope of the duty the university owes to students. On this point, I would emphasize the dissent's footnote 15: the code of conduct demonstrates that a university recognizes its authority to control off campus conduct and its knowledge of how off campus conduct can impact the well-being of a students in the university community—on and off campus. *Id.* at 34. I am hesitant, however, to join the dissent in applying the code of conduct to assess Culhane's past behavior, as I believe this suggests the conclusion that the university breached its duty. That remains a question for the jury.

In conclusion, I would hold, as the dissent does, that the answer to the first certified question is yes and that the answer to the second certified question turns on legal foreseeability within the scope of the university's undertaking with respect to its students. The specific contours of the standard of care animating the university's duty with respect to student victims and student perpetrators, as well as questions of factual foreseeability and ultimate liability, are not before us.

_____
Stephens, J.

_____
Whitener, J.

3